# United States Court of Appeals
## For the First Circuit

No. 09-2251

UNITED STATES OF AMERICA,

Appellee,

v.

EDGAR RAMOS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

Before

Lynch, Chief Judge,
Selya and Howard, Circuit Judges.

Tamara Fisher, with whom Catherine K. Byrne, Assistant Federal
Public Defender, was on brief, for appellant.
Mark T. Quinlivan, Assistant United States Attorney, with whom
Carmen M. Ortiz, United States Attorney, was on brief, for
appellee.

December 17, 2010

**LYNCH**, **Chief Judge**.  The issue presented is whether, within weeks of the Madrid commuter rail bombings in 2004, Massachusetts Bay Transit Authority (MBTA) police had reasonable suspicion of a terrorist plot on a major Boston bus and rail station permitting an officer to open the door of a van, which was, unusually, sitting stationary but with a driver and passengers inside, in the station's commuter parking lot.  The prosecution and defendant agree that this action of the MBTA police, for Fourth Amendment purposes, amounted to a "seizure," requiring reasonable suspicion that criminal activity may have been afoot.  That this proved not to be a criminal terrorist plot at all but rather a criminal plot to transport aliens illegally is immaterial.

The driver of the van, Edgar Ramos, moved to suppress evidence stemming from the MBTA's investigative search.  The district court held four days of evidentiary hearings and ultimately denied the motion, concluding in a well-reasoned opinion that there was reasonable suspicion.  See United States v. Ramos, 591 F. Supp. 2d 93 (D. Mass. 2008).  Ramos then conditionally pled guilty to illegally transporting aliens in Charlestown, Massachusetts.  See 8 U.S.C. § 1324(a)(1)(A)(ii).  We affirm the district court's denial of Ramos's motion to suppress.

I.

We recount the facts briefly.  We refer the reader who wishes to read more details to the district court opinion.

-2-

Thousands of public transit passengers use the Sullivan Square MBTA station, in Charlestown, Massachusetts, every day. Sullivan Square Station is a terminal for both subway and bus lines and is located underneath a heavily used interstate highway, I-93. Adjacent to the station, there is a parking lot owned by the MBTA that holds over 200 cars. Drivers may pay to park, or may pull into the lot briefly to pick up or drop off passengers at the station.

On May 28, 2004, the Friday before Memorial Day, MBTA inspector Patricia Pitts noticed, as she arrived at work at Sullivan Square Station around 6:50 a.m., that a white passenger van with two visible occupants was parked in the station's parking lot. On May 28, the MBTA was on high alert as to a possible terrorist attack and employees were asked to be particularly observant.[1]

The day before, Pitts had attended a one-day MBTA training seminar on identifying potential terrorist threats. With this training in mind, she found the van worthy of concern because it was irregular for vehicles to remain parked in the lot with occupants inside. She knew, from her more than twenty years of experience at the MBTA, that people usually park in the lot in

---

[1] The MBTA's internal alert system was related but not identical to state and national systems. The alert level changed in response to both threats in other countries and the MBTA's internal training needs, and was set on high alert while MBTA employees received antiterrorist training.

order to "park and ride," leaving their cars and then riding either a bus or the subway. People use a specific area, on the side of the parking lot nearest the station, to stop briefly to pick up or discharge passengers. The van was not parked near the pick-up and discharge area, but rather at the far end of the lot.

Observing from the station, Pitts realized that there were more than two men in the van when she saw several men step out of the van. She saw one write something on a piece of paper. Her terrorism training seminar had taught her that people writing notes at MBTA stations could be planning where to plant explosives. Furthermore, she thought, if the writing concerned legitimate work at the MBTA lot, the van's occupants should have stopped at the station and displayed a work permit, which they had not done. The men soon got back in the van, after just enough time to stretch their legs. This too was irregular behavior. Pitts decided to take a closer look at the van and took a bus from the station to the far side of the parking lot where the van was parked.

Walking past the van, she saw that it had a paper license plate over a regular license plate, which her terrorism training seminar had taught her was suspicious and should be reported. She also observed that the van had tinted windows, partially obscuring the view of the van's interior. She saw there were more than five men sitting in the van, including in the vehicle's back seats. She looked at the other vehicles in the parking lot, and saw that none

-4-

had people sitting in them; only this van did.  Further, the two men in the driver's and front passenger's seats appeared to Pitts to be Middle Eastern.[2]  The court asked Pitts what characteristics she had observed that caused her to think the people in the van looked Middle Eastern.  Pitts answered, "like myself, they [were] darker in the skin.  Their skin was darker."

Pitts called an MBTA dispatcher and stated her suspicions and the reasons for them.  Pitts is not herself in the MBTA police; she had been trained to give information to the dispatcher to give to the police.  The dispatcher put out a dispatch to the MBTA police explaining that there were two vans in the parking lot at Sullivan Square Station, "and one of them had a paper plate.  A couple of guys got out of them, believe it or not, of Middle Eastern descent."  The dispatcher continued, stating that an MBTA inspector had reported that "[i]t made her feel very uncomfortable.  She saw them congregatin' and one had a paper plate."  This was a report of suspicious behavior, although it did not detail all of Pitts's reasons and mistakenly said there were two vans.

MBTA Officers O'Hara and Silen responded within five minutes, parking their patrol car behind the white van.  Officer

_____

[2]    Pitts, who is African-American, was mistaken.  The men were not Middle Eastern.  The driver, Ramos, and front-seat passenger were of Mexican descent.

Others made the same mistake.  Later, after the occupants got out of the van, one of the officers present radioed the dispatcher, saying, "We're suspicious, Middle Eastern male."

O'Hara, with several years of MBTA experience, had received specialized terrorism training, was aware of the commuter train bombings less than three months before in Madrid, Spain, and was aware that metropolitan transit systems were considered likely terrorist targets. More specifically, he had been taught to be suspicious of vehicles large enough to hold a significant amount of explosives, such as this van.

Concerned about their safety, the two officers approached the van in "tactical form." Instead of going straight to the side of the van, they approached "at an angle so we'd get the best visuals of anybody that might have been looking through the windows or that could come at us," giving themselves "a better chance for cover, God forbid, if something happened." One reason for this approach was that the officers could not see what was happening through the tinted rear and rear side windows of the van.

Officers O'Hara and Silen walked from the rear toward the passenger's side of the van while an officer from another cruiser, which had just arrived, walked toward the driver's side. O'Hara could not see the driver of the van.

At this point, O'Hara knew that an MBTA inspector had expressed suspicion after observing that there were several people sitting in a parked van, that those people had congregated outside the van, and that the van had a temporary paper plate. From his

own observations and his experience as a transit police officer, Officer O'Hara also knew:

1. Transit rail stations were, especially after the recent Madrid bombings, considered likely targets for terrorist attacks.

2. The van was parked in the farthest corner of the parking lot.

3. Drivers did not usually remain in their vehicles after parking, but the occupants of the van had remained in the van for at least twenty minutes (since the first observation by Pitts) by the time the officers had arrived. O'Hara could not recall even one time when he had seen people sitting in a parked vehicle in these MBTA parking spaces for any such time.

4. The van had tinted, not clear, windows except for the front seat windows. Despite tinted windows, the shadows of several heads were visible in the back of the van.

5. The van had a temporary paper, Texas license plate over the regular plate; paper license plates were suspicious generally and out-of-state license plates, especially from states so far away, were unusual.

6. Large vehicles like vans are more likely than smaller vehicles to be able to hold a significant amount of explosives.

7. He had been trained in particular to look for box vans and while this was not a box van, it was a large passenger van, which raised the same concerns that it could carry a large amount of explosives.

8. While the dispatcher had stated the van's occupants were of Middle Eastern descent, O'Hara could not remember whether he had personally made this observation.[3]

Officer O'Hara had also been trained to keep his eyes on a person's hands, to make sure the person does not have weapons or potential detonation devices like cell phones, but he could not see the passenger's hands. When O'Hara reached the front passenger door, he opened the door in order to see the passenger's hands, asking, "what are you guys doing here?" When the male passenger did not immediately respond, he ordered him out of the van.

Officer O'Hara was aware that another officer was at the driver's side communicating with the driver, Ramos. That officer had knocked on the driver's side window. Once O'Hara ordered the

_____

[3] There is no suggestion he had reason to doubt the information he was given.

passenger out of the van, the other officer ordered Ramos out as well, and the officers opened the rear doors and ordered the remaining passengers out one by one.

Defendant Ramos, who is of Mexican descent, produced a Texas driver's license.  The passengers in the back of the van, when asked for identification, produced Brazilian passports, each with entry stamps for Mexico, but no indication of lawful entry into the United States.

The officers had all of the van's occupants transported to MBTA headquarters, where they were questioned by U.S. Immigration and Customs Enforcement (ICE) agents.  They were eventually taken to the Boston ICE office, where they were informed of their Miranda rights and questioned further.  This criminal prosecution followed.

II.

We review the district court's ultimate Fourth Amendment "reasonable suspicion" determination de novo.  Ornelas v. United States, 517 U.S. 690, 699 (1996).  We take the underlying factual determinations as found unless they are clearly erroneous.  Id. There is no serious claim of error in the district court's detailed findings of fact, which were carefully done and meticulous.

The prosecution concedes that the opening of the van door amounted to a temporary "seizure" for purposes of investigation under the Fourth Amendment, and we do not test that proposition.

There is no claim that, so long as the initial seizure is found to be reasonable, the ensuing actions by the officers were unreasonable, and there is no challenge to the arrests.

We note as a preliminary matter that the nature of the intrusion in opening the front passenger door was minimal. Cf. United States v. Stanfield, 109 F.3d 976, 982 (4th Cir. 1997) (finding opening of vehicle door for officer safety a de minimis intrusion during otherwise lawful traffic stop). Officer O'Hara, it is true, could have knocked on the van door and asked for identification, without raising Fourth Amendment concerns. United States v. Espinoza, 490 F.3d 41, 48 (1st Cir. 2007) ("[E]ven without reasonable suspicion, [an officer] ha[s] the right to approach the parked vehicle and talk to its occupants if that interview [is] purely consensual."); see also United States v. Drayton, 536 U.S. 194, 200 (2002) ("[O]fficers do not violate the Fourth Amendment[] . . . merely by approaching individuals . . . and putting questions to them if they are willing to listen."). That he chose instead to open the van door (apparently in order to see the passenger's hands), while another officer talked to the driver, did involve a greater intrusion into privacy, but it was a small one.[4]

---

[4] Because we find there was reasonable suspicion to justify this action, we do not consider the effect of Pennsylvania v. Mimms, 434 U.S. 106 (1977), and Maryland v. Wilson, 519 U.S. 408 (1997).

Ramos's argument on appeal is that the officers did not have a reasonable suspicion permitting them to open the door of the van under Terry v. Ohio, 392 U.S. 1 (1968), and its progeny. Terry held that the police can stop and briefly detain a person for investigative purposes even if the officer lacks probable cause if the officer has reasonable suspicion supported by articulable facts, id. at 20-21, that "criminal activity may be afoot," id. at 30. See also United States v. Monteiro, 447 F.3d 39, 43 (1st Cir. 2006) (explaining the requirement of reasonable suspicion of criminal activity arising from specific and articulable facts). The Terry analysis is commonly said to have two steps, the first concerned with the initial seizure, and the second with the reasonableness of the actions taken thereafter. Schubert v. City of Springfield, 589 F.3d 496, 501 (1st Cir. 2009). Ramos presents his argument as concerning only the first step.

Under a Fourth Amendment reasonableness inquiry, there are no per se exclusions or inclusions of any particular fact. See United States v. Arvizu, 534 U.S. 266, 274-75 (2002) (holding that courts may not simply exclude facts susceptible of innocent explanation from reasonable suspicion analysis). A fact may be relevant or not to the existence of reasonable suspicion depending on context and circumstance. Id. at 275-76. Those same considerations may determine what weight, if any, an objectively reasonable officer would give to a particular fact.

-11-

The thrust of Ramos's argument is that, on the facts stated above, there was no reasonable suspicion justifying the "seizure," the reference to Middle Eastern appearance could not supply the missing ingredient, and any consideration of the fact that Ramos appeared to be "Middle Eastern" was impermissible and tainted the district court's conclusion.[5] We disagree.

The initial premise of Ramos's argument appears to be that only the particular circumstances directly related to the seizure are relevant. Not so. That premise runs afoul of two established strands of Fourth Amendment law. The first strand is that whether the seizure violated the Fourth Amendment must be evaluated against the "totality of the circumstances," rather than by a "divide-and-conquer" approach. Arvizu, 534 U.S. at 274; United States v. Wright, 582 F.3d 199, 205, 212-213 (1st Cir. 2009) (finding circumstances combined to support reasonable suspicion, even though most of those circumstances were potentially innocent when considered individually). The second strand is that weight must be given to police officers' training and experience. See Ornelas, 517 U.S. at 700 (finding in probable cause context that "a police officer may draw inferences based on his own experience"); Wright, 582 F.3d at 207 (stating that police officers' subjective inferences are relevant to the extent they reflect officers'

_____

[5] There is no need to enter the controversy Ramos tries to create about whether the district court did or did not consider what Ramos refers to as his "perceived Middle Eastern ethnicity."

-12-

experience and expertise).  It was entirely appropriate on these facts to consider the larger context.

Both Inspector Pitts and Officer O'Hara had received training in response to the increased threat of terrorism, and were particularly alert to the risk of attacks on public transit systems in light of the coordinated terrorist attacks on the Madrid commuter rail trains and stations on March 11, 2004, less than three months earlier.  The basic facts about those attacks are not in dispute and are matters of public record.[6]  Thirteen improvised bag bombs were hidden in rucksacks or backpacks on trains; ten exploded while the trains were in or near stations, and three that failed to explode were found in other cars of the trains.  The attacks killed 191 people and injured at least 1400 others.  A group claiming to be linked to Al Qaeda, the terrorist group based in the Middle East that carried out the September 11, 2001 attacks on the United States, quickly took credit for the bombings and, significantly, stated that it intended to strike next in the United States.  There followed other claims of Al Qaeda responsibility and

_____

[6]     For the details on the Madrid train bombings recounted here, see, for example, Lawrence Right, The Terror Web, The New Yorker, Aug. 2, 2004, at 40; Tim Golden & David Johnston, Bombings in Madrid: The Investigation, N.Y. Times, March 16, 2004, at A17; Elaine Sciolino, Bombings in Madrid: The Attack, N.Y. Times, March 12, 2004, at A1.

of plans for future attacks in the United States and other countries.[7]

The investigation by Spanish authorities, at the time Ramos was arrested, suggested that most of the persons involved in the attack were of Middle Eastern descent or origin. The prior October, an audiotape reportedly made by Osama bin Laden, the leader of Al Qaeda, had specifically threatened an attack on Spain in retribution for Spain's assistance to the United States in the Iraq war. The date of the Madrid attacks--3/11/2004--was exactly six months after the 9/11 anniversary and was the day after 911 days had elapsed since 9/11. On April 3, 2004, militants suspected in the attacks killed themselves with a suicide bomb rather than be taken in a Spanish police raid, complicating the investigation. We also note that the Madrid attacks took place during peak morning rush hour, the same time of day as the events in Ramos's case.

In response to the real prospect of terrorist attacks on public transit, the MBTA conducted specific antiterrorism training for its personnel, who were instructed to be on the alert for any activity that might suggest a terrorist attack was being planned or expected on the MBTA system.

---

[7] Ultimately, the attacks were found to have been carried out by a group inspired by and ideologically aligned with Al Qaeda, rather than by the central Al Qaeda organization itself. See Right, The Terror Web. There is no evidence that this information was known to the officers when they approached the van in the Sullivan Square parking lot.

Within this broad context, it was appropriate for the police to take into account the location of the suspicious conduct and the degree of the potential danger being investigated. What is not suspicious in one location may be highly suspicious in another. See, e.g., United States v. Martinez-Fuentes, 428 U.S. 543, 563-64 & nn.16-17 (1976) (stating that fact of Mexican appearance is more relevant to reasonable suspicion near Mexican border than near Canadian border); United States v. Ivery, 427 F.3d 69, 73 (1st Cir. 2005) (stating that the high-crime character of a particular neighborhood is one relevant circumstance). The degree of risk may bear on the facts required to support a reasonable suspicion. E.g. City of Indianapolis v. Edmond, 531 U.S. 32, 44 (2000) ("[T]he Fourth Amendment would almost certainly permit an appropriately tailored roadblock set up to thwart an imminent terrorist attack."); Florida v. J.L., 529 U.S. 266, 273-74 (2000) ("We do not say, for example, that a report of a person carrying a bomb need bear the indicia of reliability we demand for a report of a person carrying a firearm before the police can constitutionally conduct a frisk."). Further, "[f]or the words 'reasonably' and 'circumstances' an important consideration is the calendar--the times," and officers may take into account current events when evaluating potential risks. United States v. Villanueva, 15 F.3d 197, 199 (1st Cir. 1994) (finding MBTA officer's pat-down of a

disorderly teen reasonable given the high prevalence of youth gun possession at the time).

The Supreme Court has also made it clear that in a reasonable suspicion inquiry, a person's appearance is not per se an impermissible or irrelevant consideration. See United States v. Brignoni-Ponce, 422 U.S. 873, 886-87 (1975) (holding that in border area searches, an individual's apparent Hispanic ethnicity is a relevant factor in a reasonable suspicion inquiry); see also Martinez-Fuentes, 428 U.S. at 563-64 & nn.16-17 (same). There is nothing on the particular facts of this case to forbid the officers' consideration of the information that at least two of the van's occupants "appeared" to be Middle Eastern. Groups claiming to be affiliated with Middle Eastern terrorist groups had made a specific threat to the United States just weeks earlier, and metropolitan transit services were considered at risk of such attacks. The location involved was a major urban transit system, the threat was highly timely, the risk involved many lives, and the concern about terrorism was intense.

It is true that the officers were not responding to an observer's account of an ongoing crime in which descriptions of the ethnic appearances of the participants had been given. Cf. United States v. Brown, 500 F.3d 48, 55-56 (1st Cir. 2007) (finding reasonable suspicion for investigative stop when informant specified race of individual suspect along with other identifying

-16-

information).  However, a report of a threat of a crime that credibly identifies the threat as from persons likely to have a particular appearance is also germane.  Cf. United States v. Condelee, 915 F.2d 1206, 1210 (8th Cir. 1990) (finding agents at airport could take into account information that gangs would likely use sharply dressed black drug couriers); United States v. Weaver, 966 F.2d 391, 394 & n.2 (8th Cir. 1992) (finding agents at airport could consider defendant's race as one factor given agents' knowledge that young men of that race frequently transported cocaine into the city).

While in other situations there may be merit to the argument that a description of ethnic appearance is irrelevant and nothing more than impermissible profiling, the argument fails on the facts here.  The MBTA attempted to learn from the recent lessons of Madrid and had so trained its employees.  Not just the recent history of Middle East-originated terrorism, but also the explicit warnings, issued some eleven weeks before, of future strikes by the same groups in the United States, meant it was material for the officers to consider, among other facts, the risk of terrorist attacks on transit stations in major urban centers and that the persons they were investigating had a Middle Eastern appearance.  This is not a case about stereotyping or selective prosecution.  See Whren v. United States, 517 U.S. 806, 813 (1996) ("[T]he constitutional basis for objecting to intentionally

-17-

discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment.")

We wish to be very clear. Just as it cannot be said that the appearance, even ethnic appearance, of a suspect is never relevant, it certainly cannot be said that it is always or even generally relevant. See United States v. Manzo-Jurado, 457 F.3d 928, 939-40 (9th Cir. 2006) (finding no reasonable suspicion where Border Patrol relied solely on "factors forming a broad profile that would cover many lawful, newly-arrived immigrants"). If the events in this case took place at a different time or place or under other circumstances, an attribution of "Middle Eastern" appearance may not necessarily be as relevant a fact.

This is not a case in which the only basis for suspicion was Ramos' appearance.[8] Under the totality of circumstances, the officers had reasonable suspicion criminal activity was afoot.

Affirmed.

---

[8] Ramos argues that but for the reference to Middle Eastern appearance, O'Hara would not have had any suspicion whatsoever of possible terrorism. There is no evidence to support this argument; moreover, the reasonable suspicion test is objective, not subjective. See Bolton v. Taylor, 367 F.3d 5, 7 (1st Cir. 2004) ("Whether a reasonable suspicion exists is treated as an objective inquiry: the actual . . . thought process of the officer is not plumbed."); see also Whren v. United States, 517 U.S. 806, 812-13 (1995).