United States v. Jon Hagstrom          12-CR-045-SM  1/29/14
                    UNITED STATES DISTRICT COURT

                      DISTRICT OF NEW HAMPSHIRE


United States of America,
        Government

        v.                              Case No. 12-cr-45-1-SM
                                        Opinion No. 2014 DNH 018
Jon Hagstrom,
        Defendant


                        **O R D E R**


        Defendant has moved to suppress evidence obtained during a

consensual search of his baggage and briefcase, as well as

statements he voluntarily made, after his chartered private jet

aircraft was stopped and he was detained by police officers at

Hanscom Field in Massachusetts.  He asserts that the

investigative detention (a "Terry"[1] stop) was not based upon

reasonable suspicion supported by articulable facts, and so was

constitutionally infirm.  Defendant also moves to suppress

evidence later obtained during a search of his home pursuant to a

warrant issued, in large part, on the basis of incriminating

evidence and statements obtained following the challenged Terry

stop.  All of the inculpatory evidence against him, defendant

contends, is fruit of the unlawful initial stop and so cannot be

admitted in evidence against him.  An evidentiary hearing on the

_____

        [1]  Terry v. Ohio, 392 U.S. 1 (1968).

motions to suppress was held at which the government presented witnesses.

For the reasons discussed, defendant's motions to suppress are denied.

**Facts**

David Faria, an experienced narcotics detective with the Los Angeles, California, Sheriff's Department, testified that Barry Hall, a friend and colleague who worked in the Homicide Bureau, received information from Jason Wright (a friend of Hall's and an engineer) regarding apparent illegal drug activity. Because the information was related to drug activity, Hall referred Wright to Detective Faria, providing Faria with Wright's contact information.

Detective Faria spoke to Wright in a telephone conversation that took place on July 31, 2008. Wright told Detective Faria that a female co-worker had confided in him that she knew about drug activity that her boyfriend was involved in, was uncomfortable about it, and was afraid to contact law enforcement. Wright shared with Faria the details of what his co-worker told him. She said her boyfriend traveled on a private charter jet flight to the east coast in February with a male

2

named Jon Hagstrom. The boyfriend was nervous about going with Hagstrom because Hagstrom was involved in distributing narcotics across the United States. The boyfriend told her that if he did not return, or disappeared, it was because he was assisting Hagstrom in transporting narcotics to the Boston, Massachusetts, area. The boyfriend said that Hagstrom chartered private jets from Clay Lacy Aviation, and flew from the Van Nuys Airport in California. The trips were said to commonly occur once a month.

Wright identified himself, the female co-worker, and the boyfriend. He also provided an address and phone number for "John Hagstrom," and related that Hagstrom usually had approximately $2-4 million in a safe at his residence.

Detective Faria conducted a background check on Wright and learned that he had no criminal record. He also confirmed the address given to him as Jon Hagstrom's. He called the phone number provided by Wright and confirmed that a male named Jon answered, and that the voicemail feature was also answered by a male named Jon. In addition, Faria examined a financial report related to Hagstrom, developed by the Sheriff Department's Asset Forfeiture Unit. The report noted that cash deposits to a soccer supply business associated with Hagstrom looked like "structured deposits," and "weren't typical deposits that would be for a

3

business of that type." Faria also determined that the soccer business, "Soccer Locker," appeared to be closed.

Detective Faria also visited Clay Lacy Aviation, in Van Nuys, where company managers told him that Jon Hagstrom had chartered private jets approximately three times for round trips to the east coast. The cost of each charter was between $40,000 and $50,000.

The president of Clay Lacy Aviation told Faria that a person could charter a jet from the company as long as that person's name was not on the Transportation Safety Administration's "no-fly list," and as long as payment for the charter service cleared before those services were provided. He also told Faria that Hagstrom had expressed an interest in buying a private jet valued at approximately $5 million.

On September 10, 2008, around noon, Detective Faria received a phone call from someone at Clay Lacy Aviation, who reported that Hagstrom had again leased a Gulfstream jet and was en route to Hanscom Field (just west of Boston), along with three other passengers, having departed some four hours earlier. Faria obtained the plane's registration number, and called an acquaintance, a Massachusetts State Police Sergeant, who referred

the matter to Lieutenant Thomas Coffey, of the Massachusetts State Police. Lt. Coffey called Detective Faria. Faria briefed Coffey on what he had learned, told him that he believed the Gulfstream Hagstrom chartered was being used to transport drugs, and said the aircraft was about to land at Hanscom Field. Faria asked if Massachusetts officers could "either . . . conduct a surveillance or, if they can stop and contact him, find out if they were involved in criminal activity." Hearing Tr. 189-190 (document no. 92).

Based on his conversation with Detective Faria, Lt. Coffey arranged for a state police officer stationed at Hanscom Field (Trooper Fimiani) to meet the aircraft and ask the pilots and passengers if they would be willing to wait to talk to some detectives coming up from Boston.

According to the pilots, the police officer (Fimiani) who approached the plane after it landed in Massachusetts, told them that the passengers and pilots "would all have to wait inside the airplane for the FAA." The pilots so informed the passengers. While Trooper Fimiani had a different recollection, for purposes of resolving these issues I credit the pilots' perception. Accordingly, I find that Hagstrom was temporarily detained

pending investigation when the aircraft was approached by Trooper Fimiani and the occupants were told to remain on the plane.

After speaking with Detective Faria, Lt. Coffey drove immediately from Boston to Hanscom Field, in a cruiser with lights and siren in use. He arrived about 30 to 35 minutes after the plane was stopped.

When Lt. Coffey arrived and boarded the plane he made it clear to the passengers that they were not under arrest and were free to leave. He engaged in no show of force, and he was calm, civil, professional, and conversational. He neither directly nor implicitly threatened Hagstrom. Hagstrom willingly engaged in conversation with Lt. Coffey and voluntarily agreed to answer his questions — and, as he did, Hagstrom provided Lt. Coffey with grounds to suspect that he was attempting to hide something.

Hagstrom freely answered questions put to him about the nature of the trip, and whether any illegal activity was involved. I accept Lt. Coffey's uncontradicted testimony that Hagstrom initially falsely denied that he chartered the aircraft (apparently seeking to distance himself from the charter) and later conceded that he had; that Hagstrom's explanation for the transcontinental trip (to see a "historic" baseball game between

6

the Red Sox and Rays) was not credible, at least not from a sports perspective; that his answers regarding business meetings in Boston were vague; and that his claim that his parents supported him financially seemed inconsistent with chartering a Gulfstream jet to fly across the country to watch a regular season Red Sox game.

I also credit Lt. Coffey's uncontradicted testimony that Hagstrom voluntarily consented to a search of his luggage, briefcase, and the aircraft — searches that disclosed incriminating evidence which supported the conclusion that Hagstrom was engaged in a large-scale drug-trafficking conspiracy, and which led to Hagstrom's voluntary admission to being a courier for a drug distribution operation in which he collected and transported drug proceeds.  Finally, I credit Lt. Coffey's uncontradicted testimony that Hagstrom agreed to cooperate with law enforcement and arranged to meet later in the day with Lt. Coffey.

## The Motions to Suppress

Defendant's motions to suppress evidence can succeed only if law enforcement officers detained the private jet without sufficient reason to suspect that criminal activity was afoot. The government conceded, after hearing, that a <u>Terry</u> stop

occurred.  The question remaining, then, is whether that temporary detention was lawful under the circumstances.  I find that it was.

## Discussion

<u>The Hanscom Field Stop</u>

A police officer "can stop and briefly detain a person for investigative purposes even if the officer lacks probable cause if the officer has reasonable suspicion supported by articulable facts that 'criminal activity may be afoot.'"  <u>United States v. Ramos</u>, 629 F.3d 60, 65 (1st Cir. 2010) (quoting <u>Terry</u>, 392 U.S. at 30).  The initial detention must be justified by reasonable suspicion and whatever actions are taken by the police during the detention must be reasonably related to the reason that initially justified the stop.  <u>United States v. Mohamed</u>, 630 F.3d 1, 5 (1st Cir. 2010).

Reasonable suspicion must be supported by specific articulable facts - a mere hunch is not sufficient.  And, reviewing courts must determine whether reasonable suspicion warranting an investigative stop existed by applying "a practical, commonsense judgment based on the idiosyncracies of the case at hand and an assessment whether the officer's actions were fairly responsive to the emerging tableau."  <u>United States</u>

8

<u>v. Hornbecker</u>, 316 F.3d 40, 47 (1st Cir. 2003) (citation and internal punctuation omitted).

In addition, "reasonable suspicion demands only an objectively reasonable appraisal of the facts - not a meticulously accurate appraisal." <u>United States v. Coplin</u>, 463 F.3d 96, 101 (1st Cir. 2006). The purpose of a <u>Terry</u> stop, after all, is to allow police to briefly detain someone in order to clarify ambiguous situations - to confirm or dispel reasonable suspicions that criminal activity is ongoing or has recently occurred. <u>See</u> <u>United States v. Wright</u>, 582 F.3d 199, 213 (1st Cir. 2009). Finally, reviewing courts endeavor to give "deference . . . to the experienced perceptions of the officers . . . because factual circumstances that seem innocuous to a layman might well appear suspicious (and reasonably so) to the seasoned eye of law enforcement professionals." <u>Hornbecker</u>, 316 F.3d at 47.

Here, Faria, an experienced Los Angeles, California, narcotics detective, was told by a seemingly reputable citizen (no criminal record) who identified himself, and who was well-known to one of Faria's police colleagues, that he had information regarding illegal drug distribution activity. The informant told a plausible story - that a female co-worker

9

confided in the informant that her boyfriend was nervous and told her that if he ever failed to return from a trip or disappeared it would be because of drug-related activity he was engaged in with Jon Hagstrom. She said her boyfriend told her that he had been going on trips with Jon Hagstrom from California to the east coast, on private jets, and that he (Hagstrom) was distributing drugs. The informant provided Hagstrom's address and telephone number, and related that Hagstrom usually had approximately 2 to 4 million dollars in a safe at his residence. The informant also told Detective Faria that Hagstrom chartered private aircraft from Clay Lacy Aviation in Van Nuys, California, to fly to the east coast. The informant identified the female co-worker and her boyfriend, and explained that the co-worker was concerned about her boyfriend but was hesitant to go to the police herself.

Detective Faria conducted a brief investigation, confirming Hagstrom's address and that the phone number attributed to him was answered by a male named Jon, as was an automated voicemail message. Faria also learned that Hagstrom seemed to be associated with a closed retail soccer business, the "Soccer Locker," and that the business account seemed to have had atypical deposits for such a business, suggesting possible illegal structuring. That is, Faria could reasonably infer from what he learned that Hagstrom was not wealthy, that something was

10

amiss with respect to the store's deposits, and that he had no apparent means sufficient to charter private jet aircraft.

Faria also confirmed that Hagstrom chartered private jets from Clay Lacy Aviation in Van Nuys; that the aircraft were used to take trips from California to the east coast; that the trips were expensive ($40,000-$50,000.) and seemingly well beyond his financial means;[2] and that there was no apparent legitimate or business reason for those expensive trips.

When Detective Faria was told on September 10, 2008, that Hagstrom had again chartered a jet to fly to the east coast, and was en route, he could have reasonably thought that trip fit the

---

[2] In its Response to Motion for Evidentiary Hearing on Motion to Suppress (document no. 32), the government states, without citation to any record evidence, that the president of Clay Lacy Aviation told Detective Faria that "the defendant paid approximately $40,000.00 - $50,000.00 cash for each flight." Id. at 3 (emphasis supplied). The government repeats that unsupported claim again (twice) in its Objection to Motion to Suppress Evidence and Statements Obtained During Seizure at Hanscom Civil Air Terminal (document no. 34), at 3 and 16. In its post-hearing memorandum (document no. 94), however, that factual assertion is notably absent, and the court has found no record support for the claim that Hagstrom paid for the charter services in cash. Accordingly, the court has not considered it. Detective Faria's affidavit in support of the subsequent search warrant (document no. 28-2) does, however, state that the payments Hagstrom made for each flight had to "clear" before Clay Lacy Aviation would provide charter services. So, whether Hagstrom paid in cash or in some other way, Faria could reasonably conclude that Hagstrom did, in fact, pay substantial sums for charter services.

11

story told by the informant, and was suspicious - likely related to illegal drug activity, particularly given Hagstrom's apparent inability to pay for such charters, no apparent alternative legitimate business explanation for such a trip, and that the circumstances fit, and were consistent with, the informant's tip regarding the illicit purposes of Hagstrom's flights to the east coast.

While Detective Faria perhaps could have interviewed the female co-worker and the source of the tip, her boyfriend,[3] to get a clearer explanation of all pertinent facts regarding Hagstrom's alleged involvement in drug activity, still, information provided by third-parties can create reasonable suspicion if the information contains sufficient indicia of reliability. United States v. Jones, 700 F.3d 615, 621-22 (1st Cir. 2012). Here there was sufficient indicia of reliability - the story was plausible; the source related information based on personal experience and knowledge; that information seemed self-inculpatory; the girlfriend's interest in and concern for the safety of her boyfriend tended to lend credence to her story; relevant operational facts were largely confirmed with respect to

---

[3] To the extent the boyfriend, the source of the information, was actually involved in the criminal activity and spoke against his own interests, contact by Detective Faria might, of course, have prematurely alerted Hagstrom and others that the enterprise had been compromised.

12

Hagstrom's chartering jets to fly to the east coast; Detective Faria learned that Hagstrom was unlikely to be able to afford such charters using his own financial resources; and there appeared to be no alternative legitimate reason for, or means of, chartering such expensive aircraft for such long-distance but short-duration trips.

Information provided by a member of the public need not establish a solid case or even probable cause to establish reasonable suspicion. "It suffices if a prudent law enforcement officer would reasonably conclude that the likelihood existed that criminal activities were afoot, and that a particular suspect was probably engaged in them." United States v. Taylor, 162 F.3d 12, 20 (1st Cir. 1998) (citation and internal punctuation omitted). Corroboration required for a tip to establish reasonable suspicion is "considerably less" than is required for the same tip to establish probable cause. Alabama v. White, 496 U.S. 325, 330 (1990).

Given the information available to Detective Faria at the time, I find that the Terry stop initiated by Lt. Coffey was based on reasonable suspicion, supported by articulable facts, that Hagstrom was engaged in criminal activity related to a drug-trafficking conspiracy.

13

I also find that Lt. Coffey's arrival within 35 minutes after the plane was stopped did not constitute unreasonable delay, was prompt under the circumstances, and did not convert the temporary detention into a de facto arrest. See United States v. Sharpe, 470 U.S. 675 (1985). Lt. Coffey proceeded immediately to Hanscom Field from Boston after speaking to Detective Faria. He traveled in a cruiser, with lights and siren in use to clear traffic. Given the important law enforcement purpose and particular circumstances — temporary detention of a landed airplane at a nearby airport to resolve reasonable suspicions related to drug distribution activity — the police response was both appropriate and timely. The imposition upon defendant was comparatively minor: only 30 minutes or so of delay, during which time he was free to move about the comfortable cabin of the jet.

Upon boarding the plane, Lt. Coffey made it clear that the passengers, including Hagstrom, were not under arrest, and were free to leave. They were not constrained, and no coercion was used.

Accordingly, the motion to suppress evidence obtained during the subsequent consensual search of Hagstrom's bags and the aircraft, and the incriminating statements voluntarily made by

14

Hagstrom, on grounds that all such evidence constitutes fruit of an initial unlawful <u>Terry</u> stop, is denied.

<u>The Search of Defendant's Residence</u>

Defendant also moves to suppress evidence subsequently obtained from his residence in California upon execution of a search warrant — a warrant issued in substantial part on the basis of Hagstrom's own admissions and the evidence seized following the aircraft stop at Hanscom Field. The motion is without merit since the defendant's prior admission that he was acting as a money courier for a marijuana distribution ring is admissible, and that admission provided rather strong reason to believe that evidence of his unlawful activity would likely be found in his home (records, proceeds, etc.). The warrant may have been based upon some incorrect information as well (related to Hagstrom's allegedly unusual electric power usage), but there was little evidence suggesting police officers knew of the referenced error when the information was presented to the issuing magistrate. But, more to the point, even if that information is ignored, there remained sufficient reliable information to overwhelmingly establish probable cause to search Hagstrom's residence, an admitted drug distribution conspirator. <u>See</u> <u>United States v. Jenkins</u>, 680 F.3d 101, 107 (1st Cir. 2012) ("[E]ven if the warrant were deficient (contrary to our

understanding), it could hardly be called so overbroad (or lacking in probable cause) 'as to render official belief in its [validity] entirely unreasonable.'") (quoting United States v. Leon, 468 U.S. 897, 923 (1984)). Here, too, Leon's good faith exception to the exclusionary rule would support admission of evidence found in Hagstrom's home, even if the warrant were found deficient as suggested by defendant. To be fair, defendant does not seriously contend otherwise, and seems to press the motion only on the assumption that the Hanscom Field evidence and admissions were unlawfully obtained.

In any event, for the reasons given, the motion to suppress evidence obtained pursuant to the search of defendant's residence is also denied.

## Conclusion

The motions to suppress evidence (document nos. 27 and 28) are denied.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

January 29, 2014

16

```
cc:   Debra M. Walsh, AUSA
      Robert M. Kinsella, AUSA
      Brett A. Greenfield, Esq.
      Brian M. Quirk, Esq.
      David E. Kenner, Esq.
      Michael D. Ramsdell, Esq.
      U.S. Probation
      U.S. Marshal
```