# United States Court of Appeals
## For the First Circuit

No. 13-2362

UNITED STATES OF AMERICA,

Appellee,

v.

JOSÉ LUIS AVILÉS-VEGA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Lynch, Chief Judge,
Howard and Thompson, Circuit Judges.

Jedrick H. Burgos-Amador for appellant.
Juan Carlos Reyes-Ramos, Assistant United States Attorney,
with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and
Nelson Pérez-Sosa, Assistant United States Attorney, were on brief,
for appellee.

April 13, 2015

**LYNCH, Chief Judge**.  This case presents an unusual twist on the not uncommon question of whether to suppress the results of a search based on information of a firearms sighting provided by an individual unknown to the police who provides no self-identifying information.

Acting on information provided by an anonymous caller, police officers frisked José Avilés-Vega after ordering him to get out of a parked car, and discovered a Ruger pistol, loaded with 13 rounds of 9mm caliber ammunition, in his possession.  Avilés-Vega was charged with possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g)(1), since he was a convicted felon.  Avilés-Vega moved to suppress the evidence of the firearm from the frisk, arguing that the information provided by the unidentified caller was not sufficiently reliable to provide the officers with the reasonable suspicion necessary under the Fourth Amendment.  The district court denied his motion.  United States v. Avilés-Vega, No. 12-555(FAB), 2013 WL 322525 (D.P.R. Jan. 28, 2013).  Avilés-Vega then pled guilty to possession of a firearm by a prohibited person, and was sentenced to fifty-seven months imprisonment and a three-year term of supervised release.  Avilés-Vega preserved his right to appeal the denial of his motion to suppress.

We affirm the district court's denial of Avilés-Vega's motion to suppress.  In so holding, we stress that the unidentified caller in this case stated, as he was driving, that he had just

observed conduct (which was a crime) occur in the car in front of him with sufficient detail for police officers to identify the vehicle. This report was sufficiently reliable to create reasonable suspicion of criminal activity under Puerto Rico law, thereby justifying the police officers' decision to stop and frisk the car's occupants.

I.

We take the basic facts from the magistrate judge's findings after an evidentiary hearing, supplemented by the record on appeal. These facts are not disputed.

On July 13, 2012, at 6:00 p.m., Officer Pedro López-Molinari ("López") was working as a desk sergeant at the Aguadilla police station when he received a phone call from an unidentified man. The caller reported that "four individuals in a wine-colored Chevrolet Lumina, with a license plate ending in 959 and a broken right side tail light, were traveling from Isabela to Aguadilla along Road 2." The caller said that he observed that, as the Lumina drove in the direction of Aguadilla, "the front passenger[1] passed a firearm to one of the individuals sitting in the back." The caller said that he was following the Lumina until it turned from Road 2 onto Road 459.

---

[1] The magistrate judge noted that "[t]he certified translation of Officer López's testimony does not specify gender." López confirmed on cross-examination that the caller had not provided information on the car occupants' genders or their physical descriptions.

-3-

"Following protocol, López filled out a special complaint form."  Five to ten minutes later, he notified his supervisor, Sergeant Luis Acevedo-Valentín ("Acevedo"), of the information. Acevedo instructed López "to go to [the] Road 2 intersection [with] Road 459 with two fellow officers in an unmarked PRPD vehicle to corroborate the information."  López testified that he arrived at the intersection ten to fifteen minutes later, and observed a wine-colored Chevrolet Lumina enter a shopping mall, which has a Burger King and an Asian food restaurant.  "López drove into the Burger King parking lot in order to verify the vehicle's license plate and whether it had a broken right side tail light, and saw the vehicle being parked.  From a distance of about 100 feet away, he confirmed that this vehicle fit the description provided by the anonymous caller."

Ten to fifteen minutes later, other officers arrived at the parking lot.  The officers ordered the four occupants of the vehicle, including Avilés-Vega, to get out of the Lumina; all occupants complied.  ICE Task Force Officer Javier Méndez-Rodríguez ("Méndez") saw that one of the individuals (Avilés-Vega's codefendant, Ricardo Rivera-Ruiz) was carrying a firearm on his waist as he emerged from the car.  "A PRPD officer next to Méndez removed the firearm while Méndez 'spotted' him."  The firearm in codefendant Rivera-Ruiz's possession was a Smith & Wesson pistol, with an obliterated serial number, loaded with 10 rounds of .40

-4-

caliber ammunition. "For security reasons, a pat down was performed [on] the 4 individuals." During the pat-down of Avilés-Vega, the officers found a Ruger pistol, loaded with 13 rounds of 9mm caliber ammunition.

II.

The Fourth Amendment permits police officers to conduct a brief investigative stop if they have "'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" Navarette v. California, 134 S. Ct. 1683, 1687 (2014) (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). "The 'reasonable suspicion' necessary to justify such a stop 'is dependent upon both the content of information possessed by police and its degree of reliability.'" Id. (quoting Alabama v. White, 496 U.S. 325, 330 (1990)). "[U]nder appropriate circumstances, an anonymous tip can demonstrate 'sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop.'" Id. at 1688 (quoting White, 496 U.S. at 327).

Avilés-Vega argues that a call to police from an unidentified person, who reported seeing a pistol being openly passed between the passengers of the vehicle directly in front of his car, was not sufficiently reliable to provide the police with the necessary reasonable suspicion. And, he attempts to make an argument in his reply brief, which the government says is waived,

-5-

that the police "had no reason to suspect that criminal activity was underway" even if the tip was reliable. That argument is without merit in any event.

Perhaps in another jurisdiction his second argument might have some merit. See, e.g., United States v. Ubiles, 224 F.3d 213 (3d Cir. 2000). But it does not in Puerto Rico. Puerto Rico is a concealed-carry jurisdiction. See United States v. Padilla-Colón, 578 F.3d 23, 25 n.1 (1st Cir. 2009) ("The visual display of a firearm is a crime under Puerto Rico law." (citing P.R. Laws Ann. tit. 25, § 456a(d)(1))). That means that an individual must carry a firearm in a concealed manner even if he or she possesses a license to carry the firearm. See P.R. Laws Ann. tit. 25, § 456a(d)(1).[2] So, even if everyone in Avilés-Vega's car had the necessary license, there was still a violation of Puerto Rico law by not keeping the gun concealed. If the information provided was

_____

[2] Section 2.02(d)(1) of the Puerto Rico Arms Act of 2000, P.R. Laws Ann. tit. 25, §§ 455-460k, confers licensees the right to possess, bear, and transport firearms, provided that they be "borne, carried, and transported in a hidden or unobtrusive manner . . . ." P.R. Laws Ann. tit. 25, § 456a(d)(1). To transport a weapon without a permit to carry, "the weapon must be unloaded and transported inside a closed case whose contents are not visible and which may not be in plain sight." Id. § 456a(d)(2); cf. Pueblo v. Del Rio, 13 P.R. Offic. Trans. 886, 892-93, 1982 WL 210517 (P.R. 1982) ("[C]ontrary to the custom in some Western States of the United States, where persons can openly carry a firearm, the general rule in Puerto Rico is to restrict and control the possession and/or carrying of firearms . . . .").

-6-

correct, the police had reasonable suspicion that the car's occupants had violated the concealed-carry law.[3]

In his reply brief, Avilés-Vega newly argues that the possession of a gun is not a crime. This argument was not made in his motion to suppress, his objections to the report and recommendation, or his opening brief on appeal. Thus, he not only misses the point (it was the failure to keep the weapon concealed that violated Puerto Rico law), but he has thrice waived any argument respecting this prong of the Fourth Amendment analysis.[4]

That leaves the question of whether the unidentified reporter was sufficiently reliable in the first place. See Florida v. J.L., 529 U.S. 266, 273 n.* (2000) ("The mere fact that a tip, if true, would describe illegal activity does not mean that the police may make a Terry stop without meeting the reliability requirement . . . ."). The district court concluded that the tip

---

[3] We also note that Puerto Rico law creates a presumption that the possession or act of carrying a firearm without the appropriate weapons license or permit to carry "shall be deemed as prima facie evidence of the fact that said person possesse[d] [or carried] the weapon with the intention of committing a crime." See P.R. Laws Ann. tit. 25, § 458j.

[4] The government also asserts that "the fact that the caller saw the Chevy Lumina in the same area approximately [thirty] minutes earlier made the circumstances even more troubling . . . because it suggested that the defendants were prowling that area, lurking around in search of a victim." Unlike the government, we do not think that the fact that a car with four men in it sat for approximately thirty minutes in a parking lot of a Burger King in a shopping mall is itself an inherently suspicious activity.

in this case was reliable.  Avilés-Vega, 2013 WL 322525, at *1, n.1.  We review the district court's "reasonable suspicion" determination de novo.  United States v. Ramos, 629 F.3d 60, 64 (1st Cir. 2010).  The underlying factual determinations are taken "as found unless they are clearly erroneous."  Id.

The Supreme Court has recognized that "there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'"  J.L., 529 U.S. at 270 (quoting White, 496 U.S. at 327).  We note that "there is more than one way to demonstrate" reasonable suspicion based on an anonymous tip, Navarette, 134 S. Ct. at 1692, and that we must "take[] into account 'the totality of the circumstances -- the whole picture,'" id. at 1687 (citation omitted).  At base, the reasonable suspicion inquiry requires a "commonsense approach."  Id. at 1690.

Avilés-Vega relies on J.L., in which the Supreme Court held that an anonymous tip that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun" was insufficient, "without more,"[5] to justify a police officer's stop and frisk of the defendant.  529 U.S. at 268.  The Court

_____

[5]  In J.L., the Supreme Court made clear that there is no so-called "firearm exception," whereby "a tip alleging an illegal gun would justify a stop and frisk even if the accusation would fail standard pre-search reliability testing."  529 U.S. at 272.  Here, we are resorting to no such exception.  The tip alleging the violation of the concealed-carry law was, on its own merits, a reliable basis for reasonable suspicion.

stated that "[a]ll the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about [the defendant]." Id. at 271. Although the tip helped the police to identify the defendant based on the defendant's location and appearance, it provided no information as to how the tipster knew of the alleged "concealed criminal activity." Id. at 272.

More recently, in Navarette, the Supreme Court held that an anonymous 911 call that the defendants' truck "'ran the [caller] off the roadway' . . . bore adequate indicia of reliability for the officer to credit the caller's account." 134 S. Ct. at 1688 (first alteration in original). The Court highlighted that the caller "necessarily claimed eyewitness knowledge of the alleged dangerous driving," reported the incident "soon after" it occurred, and used the 911 system. Id. at 1689-90. Based on "the totality of the circumstances," the Court "f[ound] the indicia of reliability . . . sufficient to provide the officer with reasonable suspicion that the driver of the reported vehicle had run another vehicle off the road." Id. at 1692. This, in turn, made it reasonable for the officers to execute the stop "on suspicion of drunk driving." Id. at 1690-91.

In this case, the district court properly distinguished J.L. and held that the anonymous call had sufficient indicia of

reliability to give rise to reasonable suspicion based on its report. Avilés-Vega, 2013 WL 322525, at *1, n.1. The officers' reliance on the anonymous call is justified by both its content and context.

To start, this was a report from a driver who said that he had personally observed conduct, which was a crime, committed in the car in front of him. Avilés-Vega concedes that "[t]he caller here claimed an eyewitness basis of knowledge by stating [that he had] observed the firearm as he[] drove behind the Lumina." The caller also described a wine-colored Chevrolet Lumina with a broken right side tail light, a license plate ending in 959, and four occupants. As in Navarette, the eyewitness knowledge reported by the tip "lends significant support to the tip's reliability." 134 S. Ct. at 1689.

Moreover, the tip in this case was made soon after the observation of the alleged crime. In Navarette, the "timeline of events suggest[ed] that the caller reported the incident soon after she was run off the road." Id. The Court stated that "[t]here was no indication that the tip in J.L. . . . was contemporaneous with the observation of criminal activity or made under the stress of excitement caused by a startling event, but those considerations weigh in favor of the caller's veracity here." Id. Here, too, the timeline suggests that the caller reported the incident soon after witnessing it. The magistrate judge found, and the district court

adopted, that "the caller informed [the police] that he was following the suspect vehicle in his car and contemporaneously notified the police about what he personally observed."[6] Indeed, the police found a vehicle matching the detailed description in the same area "within the half hour of receiving the call." As in Navarette, this "sort of contemporaneous report has long been treated as especially reliable." Id.

Avilés-Vega argues that the eyewitness basis of knowledge and the contemporaneous nature of the tip -- indicia of reliability that this case shares with Navarette -- are insufficient. Firstly, he argues that the call lacked predictive information regarding the future actions of the vehicle or its occupants.[7] Secondly, he says that the call was not made through the 911 emergency system. We find neither argument persuasive.

---

[6] Avilés-Vega makes a perfunctory argument that the district court clearly erred by finding that the caller contemporaneously notified the police about what he had personally observed. Avilés-Vega appears to suggest that the call could not have been made contemporaneously with the caller's observations since the caller reported the vehicle turning from Road 2 onto Road 459, and thirty minutes later the police found the vehicle at the same intersection at a shopping center. We do not find these facts incongruous, let alone rising to the level of clear error. It is entirely possible that the caller contemporaneously notified the police of his observations as the vehicle turned into the shopping center at the intersection, where the police discovered the vehicle thirty minutes later.

[7] In fact, the Lumina was in the area one would reasonably predict to find it in from the information provided.

First, the predictive information argument is misplaced. The crime alleged to have been seen here was open and obvious to the caller, and was plausibly seen from the reported circumstances (driving the next car behind). As the Eighth Circuit stated in United States v. Wheat, 278 F.3d 722 (8th Cir. 2001), the "emphasis on the predictive aspects of an anonymous tip may be less applicable to tips purporting to describe contemporaneous, readily observable criminal actions . . . ." Id. at 734; see also State v. Boyea, 765 A.2d 862, 875 (Vt. 2000) (Skoglund, J., concurring) (noting that when the call describes "a crime in progress, carried out in public, . . . [n]o intimate or confidential relationship [is] required to support the accuracy of the observation").

The Supreme Court has accordingly focused on the presence or absence of predictive information in cases where an anonymous tip alleged a concealed crime. In White, for example, the Court found an anonymous tip of concealed drug possession reliable in large part due to the predictive information that the caller provided. See 496 U.S. at 332. There, the anonymous tip reported that a woman would leave a specified apartment at a particular time in a particular car for a particular destination, and "that she would be in possession of about an ounce of cocaine inside a brown attaché case." Id. at 327. Such information could only be known to individuals with "a special familiarity with [the woman's] affairs," which the caller proved by accurately predicting her

-12-

future behavior. <u>See</u> <u>id.</u> at 332; <u>see also</u> <u>Navarette</u>, 134 S. Ct. at 1693 (Scalia, J., dissenting) ("Very few persons would have such intimate knowledge, and hence knowledge of the <u>unobservable</u> fact that the woman was carrying unlawful drugs was plausible." (emphasis added)).

In addition, the Court in <u>J.L.</u> found an anonymous tip reporting concealed gun possession unreliable in the absence of predictive information. <u>See</u> 529 U.S. at 271. The anonymous tip there claimed that the defendant had a concealed weapon, but provided the police with "no predictive information . . . to test the informant's knowledge or credibility." <u>Id.</u> "Such a tip," the Court explained, "does not show that the tipster has knowledge of <u>concealed</u> criminal activity." <u>Id.</u> at 272 (emphasis added).

In contrast with <u>White</u> and <u>J.L.</u>, the Court did not mention the lack of predictive information in <u>Navarette</u> when the anonymous tip reported the open and obvious circumstance of reckless driving. There, the anonymous caller provided specific information about the vehicle she witnessed, but never hazarded a guess about where the other vehicle was going or what its driver would do in the future. <u>See</u> <u>Navarette</u>, 134 S. Ct. at 1689-90. Predictive information would have been irrelevant since "[a] driver's claim that another vehicle ran her off the road . . . necessarily implies that the informant knows the other car was driven dangerously." <u>Id.</u> at 1689. "This is in contrast to <u>J.L.</u>,

where the tip provided no basis for concluding that the tipster had actually seen the gun," or "White, where . . . there was scant evidence that the tipster had actually observed cocaine . . . ." Id.

Like in Navarette, the anonymous caller in this case did not need to prove knowledge of the defendant's affairs through predictive information.[8]  The caller reported what any public observer could have seen -- the make, model, color, and occupancy of the car, as well as its apparent trajectory and part of its license plate.  He also explained that he was in a position to see the alleged crime.  These details, corroborated by the police when they arrived, allowed the police to be sure that they were approaching the correct vehicle.

Second, the "use of the 911 system" was not necessary to make this tip reliable given the totality of the circumstances.  In Navarette, the Supreme Court noted that "[t]he caller's use of the 911 system is . . . one of the relevant circumstances that, taken together, justified the officer's reliance on the information reported in the 911 call."  Id. at 1690.  The Court explained that a 911 call allows for the recording, identifying, and tracing of callers, "thus provid[ing] some safeguards against making false

---

[8]  As explained above, the caller witnessed a crime when he observed the occupants pass the firearm between them.  Based on Puerto Rico law, the caller did not need to know that the passengers lacked a license, or had felony convictions.

-14-

reports with immunity." Id. at 1689-90. The call in the present case, however, was made directly to the desk sergeant at the police station. The government has not argued that this direct line used similar technology to the 911 line. There is simply no evidence on this point.

Avilés-Vega argues that "the [Navarette] decision would [not] hold water absent the reliability gleaned through the use of the 911 emergency line." We disagree. The Supreme Court made clear that the use of the 911 line was only one indicator of veracity. See Navarette, 134 S. Ct. at 1689-90. A call made directly to the desk sergeant, rather than to a 911 operator, does not become unreliable solely because of that choice.

The totality of the circumstances here reduces the prospect that a personal grudge or other ill-intended purpose motivated a false report. Rather, it suggests that the caller was a concerned citizen, acting in good faith and reporting his direct observation of a crime committed in front of him. See, e.g., United States v. Copening, 506 F.3d 1241, 1247 (10th Cir. 2007) (finding that the anonymous caller's actions in reporting the events witnessed in detail, following the vehicle, and updating dispatch "bespeak an ordinary citizen acting in good faith"). We would not wish to discourage such calls.[9] As one commentator has

---

[9] We are mindful that anonymity encourages citizens to report the commission of crimes. Indeed, the government enjoys a qualified privilege to withhold from disclosure the identity, when

-15-

noted in the related probable cause context, "[c]ourts are much more concerned with veracity when the source of the information is an informant from the criminal milieu rather than an average citizen who has found himself in the position of a crime victim or witness."  2 LaFave, Search & Seizure § 3.4 (5th ed.).  The call was reliable in its report of a firearms violation in Puerto Rico.[10]

We affirm.

---

known, of "persons who furnish information of violations of law to officers."  Roviaro v. United States, 353 U.S. 53, 59 (1957); see also Puerto Rico v. United States, 490 F.3d 50, 62 (1st Cir. 2007). The Court explained that "[t]he privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation."  Roviaro, 353 U.S. at 59.

[10]  The prevalence of firearms violence in Puerto Rico is one of the reasons given for the defendant's sentence.  The district court stated that "gun crimes in Puerto Rico are pervasive throughout the island," and viewed the crime "more serious[ly] here than if it had occurred in a less violent society."