Daniel R. Domínguez, United States District Judge
"The Fourth Amendment and the personal rights it secures have a long history. At the very core stands the right of a *74 man to retreat into his own home and there be free from unreasonable governmental intrusion."
-Hon. Potter Stewart, Associate Justice of the United States Supreme Court (1958-1981)
Pending before the Court is defendant, Jasael Figueroa-Figueroa's Motion to Suppress Physical Evidence and Statements (Dkt. No. 25).[1] The United States filed its respective response in opposition thereto. See Dkt. No. 41. The Court referred this matter for Report and Recommendation to Honorable Magistrate Judge Camille Vélez Rivé. See Dkt. Nos. 35 and 36. Accordingly, the Magistrate held a Suppression Hearing on November 7, 2018. Then, on January 9, 2019, the Magistrate entered a Report and Recommendation regarding the defendant's motion to suppress. See Dkt. No. 56. On January 17, 2019, the defendant filed Objections to Report of Recommendation. See Dkt. No. 57.
After carefully evaluating the Magistrate's report and recommendations and the defendant's objections thereto, the District Court considered "the testimony of PRPD Agent Carlos Bari Martínez [was] ambiguous as to his entrance to the residence of the defendant on the date of the events." Dkt. No. 62 at 1. Therefore, the District Court held a De Novo Suppression Hearing directed for the Government to "clarify the facts surrounding [Agent Bari's] entrance to the defendant's property on February 23, 2018 while on the preventive round at Toa Baja, Puerto Rico. Id. at 2. With the benefit of Agent Bari's testimony and the parties' subsequent briefs as to this issue, see Dkt. Nos. 74, 75 and 77, the Court is now duly briefed and ready to rule on the instant matter.
I. REFERRALS TO MAGISTRATE JUDGES
The Court may refer dispositive motions to a United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). See Local Rule 159; Mathews v. Weber , 423 U.S. 261, 96 S.Ct. 549, 46 L.Ed.2d 483 (1976). Any party may contest the Magistrate Judge's report and recommendation by filing its objections. Fed. R. Crim. P. 59(b) ; 28 U.S.C. § 636(b)(1). A District Judge has various statutory conditions to follow when a Report and Recommendation has been challenged. "A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." Id. "Absent objection, ... [a] district court ha[s] a right to assume that [the affected party] agree[s] to the magistrate's recommendation." Templeman v. Chris Craft Corp. , 770 F.2d 245, 247 (1st Cir. 1985), cert. denied , 474 U.S. 1021, 106 S.Ct. 571, 88 L.Ed.2d 556 (1985). Further, "failure to raise objections to the Report and Recommendation waives that party's right to review in the district court and those claims not preserved by such objections are precluded upon appeal." Davet v. Maccarone , 973 F.2d 22, 30-31 (1st Cir. 1992) ; see *75 Henley Drilling Co. v. McGee , 36 F.3d 143, 150-51 (1st Cir. 1994) (holding that objections are required when challenging findings actually set out in a magistrate's recommendation, as well as the magistrate's failure to make additional findings); see also Lewry v. Town of Standish, 984 F.2d 25, 27 (1st Cir. 1993) (stating that "[o]bjection to a magistrate's report preserves only those objections that are specified"); Borden v. Sec. of H.H.S., 836 F.2d 4, 6 (1st Cir. 1987) (holding that appellant was entitled to a de novo review, "however he was not entitled to a de novo review of an argument never raised").
In order to accept unopposed portions of the Magistrate Judge's report and recommendation, the District Court need only satisfy itself that there is no "plain error" on the face of the record. See Douglass v. United Servs. Auto, Ass'n, 79 F.3d 1415, 1419 (5th Cir. 1996) (en banc ) (extending the deferential "plain error" standard of review to the legal conclusions of a magistrate judge that were not objected to); see also Nettles v. Wainwright, 677 F.2d 404, 410 (5th Cir. 1982) (en banc ) (appeal from district court's acceptance of a magistrate judge's findings that were not objected to was reviewed for "plain error"); see also Nogueras-Cartagena v. United States, 172 F.Supp. 2d 296, 305 (D.P.R. 2001) (finding that the "Court reviews [unopposed] Magistrate's Report and Recommendation to ascertain whether or not the Magistrate's recommendation was clearly erroneous") (adopting the Advisory Committee note regarding Fed. R. Civ. P. 72(b) ).
Thus, the Court shall conduct de novo review of the objected portions of the report and recommendation while using the aforementioned "plain error" standard for the portions that have not been objected to.
II. FACTUAL AND PROCEDURAL BACKGROUND
On February 23, 2018, the Puerto Rico Police Department (hereinafter, "PRPD") Agent, Carlos Bari-Martínez was on duty at the Bayamón Stolen Vehicles' Division. See Dkt. No. 56 at 7. He was assigned to conduct preventive rounds at San José Ward in Toa Baja and was accompanied by Sergeant Félix Rivera and Alexander González. Id. While at 16th Street, also known as "Valle Seco", PRPD observed a four-door, black Toyota Corolla, with license plate number IRS-191. Id. at 7-8. As several weeks prior, a message had been sent by the command center that some individuals in a car that fit said description were committing crimes at shopping centers in the area, PRPD reported the plate of the black automobile through a portable radio to the police command center. Id. The license plate had a notice that the vehicle was in fact stolen. Id. As a result thereof, Sgt. Rivera instructed PRPD Bari to wait for a marked police unit to arrive. Id.
Thereafter, PRPD Bari performed a visual inspection of the automobile noticing that the locks nor the ignition were forced. Id. Thus, it was reasonable to conclude that the occupant of the car had the key of the stolen vehicle in his possession. Id. Accordingly, PRPD Bari proceeded to conduct a canvas of the area via a house to house and inquiry as to the possessor of the keys of the stolen vehicle. Id. However, no one had information related to the person associated with vehicle. Id.
He eventually approached a property to the far-left of the ward that has a semi-open door.[2] Id. PRPD Bari identified himself.
*76 A male came from the interior right side of the property and stood in front of the glass door from the inside. Id. PRPD Bari opened the door to the defendant's property. Immediately after PRPD Bari opened the door, he observed the defendant had a black pistol in his waistband. He inquired the defendant as to the license to carry the firearm or lack thereof. Id. The defendant told PRPD Bari that he did not possess a license, thus, PRPD Bari proceeded to occupy the firearm and placed it on his waistband. Id. PRPD Bari then proceeded to arrest the defendant and provided him his Miranda warnings. Id.
Thereafter, the defendant was asked whether he was alone at the property for safety reasons. Id. at 9. He responded in the affirmative. Id. PRPD Bari then asked the defendant whether there were any additional firearms in the property, and he responded in the affirmative. Id. Accordingly, when inquired as to the location of the firearms, the defendant informed PRPD Bari that the firearms were in the bedroom. Id. PRPD Bari inquired as to the voluntariness of the defendant showing him where the firearms were, and the defendant consented. Id. Then, the defendant proceeded to show PRPD Bari an armory inside the bedroom including drugs, paraphernalia, as to narcotics, together with bullets. Id. The items seized include a cut-off shotgun, two AK-47, two rifles, ammunition and magazines. He also seized the gun that was in the defendant's person upon his arrest and the keys to the stolen Toyota Corolla in one of his pockets. Id.; see also Exhibits 9, 10, 11 and 12. The beeper and keys worked on the car. Id. PRPD Bari did not search the other bedrooms then. Id. Whereupon, Technical Services arrived at the property and an inventory was performed. Id. Ultimately, the PRPD handed over the keys to a neighbor as was instructed by the defendant prior thereto. Id. Eventually, family members arrived and closed the house. Id. As the Toyota Corolla had been reported stolen and subsequently recovered, the vehicle was searched. Id. The police seized two bullet magazines and 22 rounds from the interior of the Toyota. Id.
The defendant was afterwards taken to the PRPD Headquarters in Bayamón, where he was presented with the Miranda Warnings form in writing, a consent form and the inventory sheet. Id. at 10. The defendant refused to sign the documents. Id.
Thereafter, on February 27, 2018, a district court grand jury returned a Six-Count Indictment against the defendant (Dkt. No. 8) for possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(C)(1)(a)(i) ; possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a)(1) ; possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) ; possession with intent to distribute marihuana, in violation of 21 U.S.C. § 841(a)(1) ; possession of a machinegun in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(B)(ii) and; illegal possession of a machinegun, in violation of 18 U.S.C. § 922(o).
The defendant filed a Motion to Suppress , (Dkt. No. 25) wherein he moves the Court to suppress all the evidence seized from his home, from his person and his statements. In sum, the defendant contends the entry of the police to his house, the search of his house, the search of his person and his arrest (all done without a warrant) were not lawful because there was no probable cause and no exigent circumstances. Whereas, the Government argues the police officers entered the house legally based on probable cause to arrest and exigent circumstances. The Government *77 further avers the defendant gave consent to search.
The Motion to Suppress was referred to Honorable Magistrate Judge Vélez-Rivé for hearing and Report and Recommendation. The Magistrate is recommending the DENIAL of the motion to suppress. See Dkt. No. 56. The Magistrate finds that the PRPD officers lawfully reached their vantage point as they were in the area on a routine patrol. Upon finding the vehicle and confirming it was stolen, the officers began canvassing the neighborhood to learn additional information and, as part of this canvas, they approached and knocked on defendant's front door which was ajar. According to the Magistrate, PRPD Bari, saw, through the glass door, that the defendant was armed.[3] As to the warrantless arrest, the Magistrate Judge concluded that as PRPD Bari asked the defendant whether he had a license to carry the firearm, and the response was in the negative, and the possession of a firearm without license is a violation of Puerto Rico law, probable cause was established. More importantly, an individual who visually displays a firearm violates the Puerto Rico Law even if he possessed a firearms permit.[4] The testimony of PRPD Bari, and corroborating testimony of PRPD González, are uncontested as the defendant did not present witnesses to rebut the government's position. Finally, as to the warrantless search of the home, the Magistrate found the defendant provided valid consent. PRPD Bari's testimony as to defendant voluntarily taking him to a bedroom in the house and showing him the illegal items is uncontested. Thus, defendant willingly took PRPD Bari to the bedroom where additional firearms were located upon his arrest.
III. DE NOVO SUPPRESSION HEARING
It is a well-established fact that "[a] district judge may not reject a magistrate's findings as to the credibility of a witness without hearing the witness testify first-hand." United States v. Hernandez-Rodriguez, 443 F.3d 138, 148 (1st Cir. 2006). In fact, "if the judge does not hear the witnesses his decisions on credibility issues can only be a blind guess, when it intimates that a district judge may not reject a magistrate's findings without hearing the witnesses." United States v. Raddatz, 447 U.S. 667, 701, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980).
Thus, upon careful examination of the Magistrate's Report and Recommendation and transcript of the proceedings, the Court found that the testimony of PRPD Bari was ambiguous as to the circumstances surrounding his entrance to the defendant's residence on the date of the events. Accordingly, the Court held a De Novo Suppression Hearing, wherein PRPD Bari was produced by the Government in order to clarify the facts surrounding his entrance to the defendant's property on February 23, 2018 while conducting a preventive round at Toa Baja, Puerto Rico. With the benefit of PRPD Bari's testimony as well as supplemental briefs filed by the parties, the Court is now ready to rule upon the instant matter.
IV. LEGAL ANALYSIS
A. Standing
It is well settled that "the [Fourth] amendment's prohibition against *78 unreasonable searches and seizures extends only to protect those places and interests in which the accused can be characterized as having a legitimate expectation of privacy." United States v. Cruz-Jimenez, 894 F.2d 1, 5 (1st Cir. 1990). In order to make such a demonstration, the defendant must show both a subjective expectation of privacy and that society accepts that expectation as objectively reasonable. United States v. Mancini, 8 F.3d 104, 107 (1st Cir. 1993). The defendant must demonstrate a privacy expectation in both the item seized and the place searched. United States v. Salvucci, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980) ("[W]e must ... engage in a conscientious effort to apply the Fourth Amendment by asking not merely whether the defendant had a possessory interest in the items seized, but whether he had an expectation of privacy in the area searched.")(internal quotations omitted); United States v. Aguirre, 839 F.2d 854, 856 (1st Cir. 1988) ("Before embarking upon the merits of a suppression challenge, a criminal defendant must show that he had a reasonable expectation of privacy in the area searched and in relation to the items seized.").
During the Suppression Hearing, the Magistrate heard the testimony of the defendant's wife, Coralys Santiago. According to Ms. Santiago, she and the defendant bought the property subject of the instant case on December 19, 2017. See Transcript of Proceedings, Suppression Hearing, November 7, 2018 , Dkt. No. 53 at 12, l. 13-23. They eventually moved to the property around three (3) months thereafter, as they were fixing the property from damages suffered due to the passing of Hurricane María. See Id., at 13, l. 6-17. As part of the improvements, the defendant placed a new roof on the property. See Id., at 16, l. 2-7. New windows and several additional repairs were performed on the house. See Id. at 26, l. 15-18. Presently, Ms. Santiago lives at said property.[5] Upon the conclusion of Ms. Santiago's testimony, the Magistrate made the following finding:
"I believe the testimony of Ms. Santiago suffices to establish standing. She has testified that they bought the house, she and the husband, which is the defendant, in December; that they fixed the house for a couple of months.
He was arrested in February and she moved sometime in March or April. So I find that there is standing to raise or challenge the suppression, to raise the suppression and challenge the evidence which was seized."
Id. at 35, l. 10-18.
As the Government did not contest the Magistrate's ruling that the defendant, in fact, had standing to challenge the admission of illegal items seized from his own home, and the Court finds that in effect, the defendant has certainly met the requirements for standing, the Court needs not to proceed further as to this issue.
B. Fourth Amendment
The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend IV. It is hornbook law that the protection conceded by *79 the Fourth Amendment is greater in the privacy of a person's home. To that effect, the Supreme Court has held that,
"The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home-a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their ... houses ... shall not be violated." That language unequivocally establishes the proposition that "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."
Payton v. New York, 445 U.S. 573, 589-90, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (quoting Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 683, 5 L.Ed.2d 734 )(Emphasis ours).
It is important to note that "the area 'immediately surrounding and associated with the home'-what our cases call the curtilage-[is regarded] as 'part of the home itself for Fourth Amendment purposes.' " Fla. v. Jardines, 569 U.S. 1, 6, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013). In fact, " '[t]he protection afforded [to] the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened.' " Collins v. Virginia, --- U.S. ----, 138 S. Ct. 1663, 1670, 201 L. Ed. 2d 9 (2018) (quoting California v. Ciraolo, 476 U.S. 207, 212-213, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986)).
Moreover, the Supreme Court has consistently held that "any physical invasion of the structure of the home, 'by even a fraction of an inch,' [is] too much." Kyllo v. United States, 533 U.S. 27, 37, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (quoting Silverman v. United States, 365 U.S. 505, 512, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)). In sum, "[n]o invasion of the sanctity of the home can be dismissed as de minimis. " Loria v. Gorman, 306 F.3d 1271, 1284 (2nd Cir. 2002). Further, the Ninth Circuit addressed the potential expectation of privacy that a resident of a property may have when a police officer opens the screen door when solid door is open, holding that,
"In the summer, when people leave their solid doors open for ventilation, the screen door is all that separates the inside from the outside. People can get a resident's attention by knocking on the screen door without opening it. Where the solid door is wide open, the screen door is what protects the privacy of the people inside-not just their visual privacy, which it protects only partially, but also their privacy from undesired intrusion. Where the solid door is open so that the screen door is all that protects the privacy of the residents, opening the screen door infringes upon a reasonable and legitimate expectation of privacy. This is what happened here.
The police cannot breach the reasonable expectation of privacy that people have in their homes without consent or a search warrant, unless one of the exceptions to the search warrant requirement applies. Once the screen door was open and the officers spotted the gun, the legal distance to a justified entry was short indeed. But the gun was not spotted until after the agent opened the screen door. Where the screen door is the only barrier between the inside of the house and the outside, the police cannot open the screen door without consent or some exception. Arellano-Ochoa did not consent."
United States v. Arellano-Ochoa, 461 F.3d 1142-1144 (9th Cir. 2006).
*80 Whereas, the "probable cause" requirement stems of the Fourth Amendment. The Supreme Court has described "probable cause" as a "fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). "[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]" that probable cause existed. Id. at 223-39, 103 S.Ct. 2317 (citing Jones v. United States, 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960) ).
The First Circuit standard as to search warrants provides that "[a] warrant application must demonstrate probable cause to believe that (1) a crime has been committed ... and (2) enumerated evidence of the offense will be found at the place to be searched ..." United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999). "A finding of probable cause does not demand proof beyond a reasonable doubt ... it demands proof sufficient to support a fair probability that a crime has been committed and that evidence of that crime is likely to be found within the objects to be searched." United States v. Coombs, 857 F.3d 439, 446 (1st Cir. 2017) (Internal citations omitted). However, the "ultimate touchstone of the Fourth Amendment is reasonableness." Brigham City, Utah v. Stuart, 547 U.S. 398, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006).
"In assessing whether there was probable cause for a search, '[the First Circuit's] task, like that of the ... district court, is simply to make a practical, common-sense decision whether, given all the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " United States v. Ramirez-Rivera, 800 F.3d 1, 27 (1st Cir. 2015) (quoting United States v. McLellan, 792 F.3d 200, 208 (1st Cir. 2015)). Thus, "[t]he government bears the burden of proving the lawfulness of the search." United States v. Lopez, 380 F.3d 538, 543 (1st Cir. 2004). "That burden is heaviest when consent would be inferred to enter and search a home, for protection of the privacy of the home finds its roots in clear and specific constitutional terms: '[t]he right of the people to be secure in their ... houses ... shall not be violated.' " United States v. Shaibu, 920 F.2d 1423, 1426 (9th Cir. 1990).
For a warrantless arrest, the Fourth Amendment is taken to require "probable cause ..." Valente v. Wallace, 332 F.3d 30, 32 (1st Cir. 2003). On that note, "the Supreme Court has [established] that probable cause means more than "bare suspicion" but less that what would be needed to "justify ... conviction." Id. (citing Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)). In other words, "the quantum of information which constitutes probable cause-evidence which would 'warrant a man of reasonable caution in the belief' that a felony has been committed, must be measured by the facts of the particular case." Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (citations omitted).
Conversely, the Supreme Court has consistently held that "the Fourth Amendment to the United States Constitution ... prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest. Payton, 445 U.S. at 575, 100 S.Ct. 1371. To that effect, there is "[a] long-settled premise that, absent exigent circumstances, a warrantless entry to search for weapons or contraband is unconstitutional even when a felony has been committed and there is probable cause to *81 believe that incriminating evidence will be found within." Id. at 573, 100 S.Ct. 1371.
In the case at bar, PRPD Bari was assigned to perform a preventive round at San José Ward in Toa Baja. Thus, no search warrant was issued prior thereto. Upon his arrival to the area, he identified a vehicle that was thereupon returned with a stolen vehicle lien. As a result thereof, PRPD Bari began canvassing the area by inquiring the residents of the ward the whereabouts of the owner of the vehicle. None of the residents had information as to the identity of the possessor of the Toyota.
Eventually, PRPD Bari approached a residence that was located to the far-left. The door was "semi-open". Transcript of the De Novo Suppression Hearing , Dkt. No. 72, p. 20, l. 20-25 to p. 21, l. 1. According to PRPD Bari, the door was "more or less a foot" open. Id. at p. 22, l. 6. PRPD Bari announced his presence and the defendant emerged from the interior right side of the property (to the left of PRPD Bari) and stood in front of the glass from the inside. However, as the Court found that PRPD Bari's testimony as to what happened thereafter was incomplete, a De Novo Hearing was scheduled. The Court explains.
PRPD Bari's testimony before the Magistrate Judge was that "when [PRPD Bari] see[s] [the defendant], and open[s] the door and [he] see[s] him standing there with the pistol, [he] asked [the defendant] if he has a license to carry a gun and he told [PRPD Bari] he didn't." Transcript of Suppression Hearing , Dkt. No. 53, p. 50, l. 18-23. As to where PRPD Bari was located when he saw the firearm for the first time, he testified that,
"Q. Going back a little bit, when you first see him, were you on the outside of the door or were you inside the door?
A. The first time that I saw him?
Q. Yes.
A. Yes, I'm outside the door.
Q. When you see him with the firearm, are you still standing outside the door?
A. No, at that point I have entered.
Q. Okay and when you asked him if he had a firearm's permit, are you still inside?
A. Yes.
Q. Okay, so when you arrested him, you were inside the house.
A. Correct."
Id. at p. 51, l. 18-25 to p. 52, l. 1-7. (Emphasis ours). Subsequently, during the De Novo Suppression Hearing, the Court requested clarification as to the circumstances surrounding PRPD Bari's entrance at the property. PRPD Bari ultimately clarified and testified that he saw the defendant coming from the right side of the property. Thereupon, PRPD Bari opened the door and then, saw the gun as included herein,
"BY MR. PASSANISI [AUSA]:
Q. What did you do, if anything, to the door before you saw the pistol?
A. Well, I opened it.
Q. You opened the door before you saw the pistol; is that correct?
A. Yes."
Dkt. No. 72 at p. 22, l. 21-25 to p. 23, l. 2. (Emphasis ours).
As previously discussed, the very core of the Fourth Amendment is the protection of a person's privacy in his own home. Thus, absent exigent circumstances, a warrantless entry to search for weapons or contraband is deemed unconstitutional even when there is probable cause to believe that incriminating evidence will be found at the place being searched. See Payton, 445 U.S. at 573, 100 S.Ct. 1371. More importantly, the Supreme Court has emphasized that "any physical invasion of *82 the structure of the home, 'by even a fraction of an inch,' [is] too much." Kyllo, 533 U.S. at 37, 121 S.Ct. 2038.
Upon a careful review of PRPD Bari's testimony, the Court finds there was no indication there was probable cause to enter the defendant's property without a warrant before opening the door, as PRPD Bari did not see a potential criminal activity, i.e. the illegal pistol[6] , until after opening the door and identified a gun in the defendant's waistband. As the Government has failed to raise exigent circumstances that require entry to the defendant's home, a warrant was necessary.
The Court simply cannot overlook the heightened degree of protection to which a person is entitled in the sanctity of their home. Thus, it is safe to conclude that PRPD Bari's act of opening the door to the defendant's house without a warrant and without probable cause of criminal activity to do so, was an invasion of the defendant's privacy. However, prior to ruling upon the controversy at hand, the Court deems necessary to evaluate whether the defendant consented to PRPD Bari's entrance to his property, thus, correcting the probable cause deficiency that the Court has identified.
C. Consent
The Fourth Amendment prohibits unreasonable searches and seizures. Thus, a warrantless search of a suspect's premises is, per se , unreasonable under the Fourth Amendment unless the government shows that the search falls within one of a carefully defined sets of exceptions, such as a valid consent. Florida v. Royer, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) ; Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) ; United States v. Tibolt, 72 F.3d 965, 968-69 (1st Cir. 1995), cert. denied , 518 U.S. 1020, 116 S.Ct. 2554, 135 L.Ed.2d 1073 (1996). Accordingly, the government has the burden of proving whether the consent obtained by the defendant was voluntarily given. See United States v. Mendenhall, 446 U.S. 544, 557, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).
To be valid, such consent must be provided by a suspect by either word or act, but the words or conduct must be unambiguous, and the consent must be freely and voluntarily given. Although in some circumstances courts may infer consent from defendant's cooperative attitude, it is the government the one bearing the burden of proof to establish consent. Royer, 460 U.S. at 497, 103 S.Ct. 1319 ; Schneckloth v. Bustamonte, 412 U.S. at 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). However, a search conducted pursuant to consent may not exceed the scope of the consent sought and given. Florida v. Jimeno, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991) ; United States v. Donlin, 982 F.2d 31, 33 (1st Cir. 1992). Furthermore, the question of voluntariness is one of facts to be determined from the totality of the circumstances. United States v. Mendenhall, 446 U.S. 544, 557, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) ; United States v. Barnett, 989 F.2d 546, 554-555 (1st Cir.), cert. denied , 510 U.S. 850, 114 S.Ct. 148, 126 L.Ed.2d 110 (1993).
Among the factors that courts have considered in evaluating the voluntariness of the consenting party are: the suspect's age, education, experience, intelligence, and knowledge of the right to withhold consent; whether the person was advised of his constitutional rights; whether permission to search was obtained by coercive means or under inherently coercive circumstances; whether the person was in *83 custody and Miranda Rights have been given; whether the person was told a search warrant could be obtained; and the length and nature of the detention and interrogation. See United States v. Barnett, 989 F.2d at 554-555 ; United States v. Al-Azzawy, 784 F.2d 890, 895 (9th Cir. 1985), cert. denied , 476 U.S. 1144, 106 S.Ct. 2255, 90 L.Ed.2d 700 (1986) ; United States v. Alfonso, 759 F.2d 728, 741 (9th Cir. 1985) ; United States v. Salvador, 740 F.2d 752, 757-58 (9th Cir. 1984), cert. denied , 469 U.S. 1196, 105 S.Ct. 978, 83 L.Ed.2d 980 (1985). However, it is important to note that no single factor will, by itself, be conclusive as to the voluntariness of the consent. Further, the question of voluntariness is one of the facts to be determined from the totality of the circumstances.
Finally, as further guidance, the Court recurs to the guidelines established by the Ninth Circuit that enable the trial judge to determine whether effective consent was obtained prior to conducting a warrantless search,
"It must show that there was no duress or coercion, express or implied. The consent must be 'unequivocal and specific' and 'freely and intelligently given'. There must be convincing evidence that defendant has waived his rights. There must be clear and positive testimony. 'Courts indulge every reasonable presumption against waiver' of fundamental constitutional rights'. Coercion is implicit in situations where consent is obtained under color of the badge, and the government must show that there was no coercion in fact. The government's burden is greater where consent is claimed to have been given while to defendant is under arrest."
United States v. Page, 302 F.2d 81, 83-84 (9th Cir. 1962) (Emphasis ours).
With these legal principles in mind, we now turn to the question of whether Agent Bari received the defendant's consent to enter and search the residence and, if so, whether the consent was voluntarily given.
In the case at bar, PRPD Bari testified that he arrived at the defendant's residence, saw the defendant coming from the right-side of the property and standing in front of the door from the inside. PRPD Bari ultimately opened the door, that was opened only by one (1) foot, identified a pistol in the defendant's waistband after opening the door, and then placed the defendant under arrest and gave him his Miranda warnings. There is no testimony from PRPD Bari that sustains he obtained any sort of consent from the defendant or observed the defendant carrying a firearm prior to opening the door of his residence and putting him under arrest.
When PRPD Bari took the stand for a second time during the De Novo Suppression Hearing, he did not clarify as to the consent he obtained from the defendant, or lack thereof, to enter the property prior to identifying the pistol that was apparently on the defendant's waistband. The applicable standard requires the consent to be freely and voluntarily provided by the defendant when entering the property that is not subject to a search warrant. The defendant ultimately informed PRPD Bari the location of the remaining contraband, but after he had been arrested, not before.
The Court finds the defendant's action of standing in front of the door is not an act of a free and voluntary consent. Rather, it is a sign that the defendant is protecting his residence from an uninvited intrusion from a police officer. The Government has failed to identify an act or word that could constitute compliance with the standard of a consent freely and voluntarily given.
*84 Another critical point under the Court's consideration is the consent provided by the defendant upon his arrest as to the additional contraband that was in the defendant's residence. As to this issue, the long-standing precedent is that,
"The question whether evidence obtained after an illegal search should be suppressed as the fruit of the poisonous tree depends upon " 'whether, granting establishment of the primary illegality, the evidence to which ... objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' "
United States v. Finucan, 708 F.2d 838, 843 (1st Cir. 1983) (quoting Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). In fact, the First Circuit has emphasized that "[s]uch an analysis depends primarily upon weighing the facts in the particular case, and is thus a matter especially suitable for resolution by the district court." Id. at 843 (citations omitted).
Pursuant to the Fourth Amendment protection and long-standing precedent, the Court finds the contraband occupied by the police on the date of the events is fruit of the poisonous tree, as PRPD Bari physically invaded the defendant's property by opening the door of the defendant's residence without consent to do so prior to identifying probable cause to conduct a warrantless search. Notably, the defendant was only cooperative upon his arrest. Thus, the Court is forced to conclude that proper consent was not obtained prior to searching and seizing contraband from the defendant's property.
D. Exclusionary Rule
Finally, the Government argues that "[t]he purpose of the exclusionary rule is to 'deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." Along these lines, the Supreme Court has held that,
"The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force."
Michigan v. Tucker, 417 U.S. 433, 447, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974). (Emphasis ours).
Accordingly, "[i]f the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." United States v. Peltier, 422 U.S. 531, 542, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975). "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." Herring v. United States, 555 U.S. 135, 144, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009).
At issue is whether PRPD Bari's decision of opening the door of the defendant's residence without consent and then, identifying a gun in the defendant's waistband is subject to the exclusionary rule. The Court finds that it does and briefly *85 explains. PRPD Bari is a police officer with 20 years of experience, who prior to working at the Office of Intelligence Section of the Local Police Department worked in the City of Bayamon Stolen Vehicles Unit. See Dkt. No. 53, p. 37, l. 5-17; and Dkt. No. 72, p. 5, l. 3-8. The Fourth Amendment protection is a subject that is widely known as it deals with a fundamental right that every person is entitled to. It is very difficult for the Court to believe that PRPD Bari was unbeknown as to the fact that opening the door of a private property without the defendant's consent and without probable cause would constitute a Fourth Amendment violation. The Government, in fact, recognizes that PRPD Bari did not have probable cause to arrest the defendant until he opened the door to the defendant's property and thereafter, saw the firearm for the first time. Thus, "[t]he government [would be] obliged to justify the arrest by the search and at the same time to justify the search by the arrest. This will not do." Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 370, 92 L.Ed. 436 (1948).
Therefore, the Court finds that the PRPD Bari was grossly negligent when intervening with the defendant, and most critical, by opening the door of the defendant's residence without his consent, without a search warrant and without observing a weapon prior thereto that would establish probable cause to enter the property. The Court further notes that PRPD Bari's actions were in clear violation of the defendant's Fourth Amendment right. This is exactly the type of conduct that is considered unlawful police conduct and must be discouraged.
V. CONCLUSION
The Court finds that the Magistrate Judge's Report and Recommendation correctly concludes that the defendant met the requirements for standing, thus, no plain error was identified. However, upon review of the record at Dkt. No. 72, it is clear that the local police officer opened the door of the defendant's residence and thereafter, saw the weapon on the defendant's waist, hence, the police officer's conduct was unconstitutional in violation of the Fourth Amendment. Accordingly, the Court hereby ADOPTS in part the Magistrate's Report and Recommendation and GRANTS the Defendant's motion to suppress.
IT IS SO ORDERED.
REPORT AND RECOMMENDATION
CAMILLE L. VELEZ-RIVE, UNITED STATES MAGISTRATE JUDGE
Defendant Jasael Figueroa-Figueroa ("Defendant Figueroa" or "Figueroa") was charged in a six count Indictment with possession of a firearm in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c)(1)(A)(i) ); possession with intent to distribute cocaine base, in violation to Title 21, United States Code, Section 841 (a)(1) and 841(b)(1)(B)(iii) ; possession with intent to distribute cocaine, in violation to Title 21, United States Code, Section 841 (a)(1) and (b)(1)(C) ; possession with intent to distribute marihuana, in violation to Title 21, United States Code, Section 841 (a)(1) and (b)(1)(D) ; possession of a machine gun in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, 924(c)(1)(B)(ii) ; and illegal possession of a machine gun, in violation of Title 18, United States Code, Section 922(o) and 924 (a)(2) ). (Docket No. 8).
Pending before this Court is Defendant Figueroa's "Motion to Suppress Physical Evidence and Statements" in which he moved the Court to suppress all the evidence seized from his home, from his person *86 and his statements. Defendant Figueroa asserted the entry to his house, the search of his house, the search of his person and his arrest (all done without a warrant) were not lawful because there was no probable cause and no exigent circumstances. (Docket No. 25).
The United States responded to the Motion to Suppress, arguing Defendant Figueroa lacked standing to question the entry and search of the house since he did not have an expectation of privacy in the place searched. The United States also argued that the police officers entered the house legally based on probable cause to arrest and exigent circumstances. The United States posited in addition that Defendant Figueroa gave consent to search. (Docket No. 41).
The Motion to Suppress filed by Defendant Figueroa was referred to the undersigned for Report and Recommendation. (Docket Nos. 35 and 36).
On November 7, 2018, the suppression hearing was held. The matter of standing was addressed first, and Defendant presented the testimony of Coralis Santiago Colón ("Santiago") because the burden is on Defendant. Direct and cross examination conducted. A verbal ruling was made that Defendant Figueroa had established standing with the testimony of Santiago. The burden then turned to the United States which presented the testimony of PRPD Agent Carlos Bari Martínez ("PRPO Bari") and PRPO Alexander González Santiago ("PRPO González"). Direct and cross examination conducted. Several Exhibits were admitted and presented into evidence. Defendant Figueroa did not take the stand on his behalf. (Docket No. 47).
On January 8, 2019, post-hearing briefs were filed by the parties. (Docket Nos. 54 and 55).
LEGAL ANALYSIS ON STANDING
The United States originally claimed Defendant Figueroa did not have standing to challenge the admission of the evidence seized on February 23, 2018 and any other evidence derived therefrom. The United States averred Defendant Figueroa had no legitimate expectation of privacy in the house searched which had no indicia that anyone lived in it. The house had no furniture, no clothes in the closets, and no food or running water. The United States claimed Defendant Figueroa lacked standing to assert a violation of his rights. (Docket No. 41, pages 2-5).
Later, the government informed the Court in its post-hearing brief that it did not object to the Court's oral ruling that Defendant had standing to seek suppression of the evidence seized. (Docket No. 54, p. 3). However, in an abundance of caution, the issue of standing is briefly discussed herein.
Defendant Figueroa presented the testimony of his wife (Santiago) at the suppression hearing to establish standing. The United States did not present any evidence on the standing issue. After hearing the testimony of Santiago, and assessing her demeanor and credibility, the Court orally found that Defendant Figueroa had standing to challenge the admissibility of the evidence seized via a motion to suppress. Defendant Figueroa met his burden of proving he had a legitimate expectation of privacy in the house and in relation to the items seized.
The concept of standing under the Fourth Amendment refers to the defendant's burden of proving a legitimate expectation of privacy as a prerequisite to challenge unlawful police conduct. United States v. Sánchez, 943 F.2d 110, 113 n. 1 (1st Cir. 1991). "We therefore use the term 'standing' somewhat imprecisely to refer to this threshold substantive determination."
*87 Id. See United States v. Cruz Jiménez, 894 F.2d 1, 5 n. 1 (1st Cir. 1990).
The term "standing" is also used as a shorthand method of referring to the issue of whether the defendant's own Fourth Amendment interests were implicated by the challenged Governmental action. "Technically, the concept of 'standing' has not had a place in Fourth Amendment jurisprudence for more than a decade, since the Supreme Court in Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), indicated that matters of standing in the context of searches and seizures actually involved substantive Fourth Amendment law." See Sánchez, 943 F.2d at 113 n. 1 ; see also United States v. Kimball, 25 F.3d 1, 5 (1st Cir. 1994).
A defendant has the burden of establishing standing. Rakas, 439 U.S. at 138-48, 99 S.Ct. 421 ; United States v. Melucci, 888 F.2d 200, 201 (1st Cir. 1989) ; United States v. Hershenow, 680 F.2d 847, 855 (1st Cir. 1982). Defendant's burden of showing that he had reasonable expectation of privacy in the area searched and in relation to the items seized to establish standing for suppression challenge must be carried at the time of the pretrial hearing and on the record compiled at that hearing. United States v. Aguirre, 839 F.2d 854, 856 (1st Cir. 1988) ; and see United States v. Mancini, 8 F.3d 104, 107 (1st Cir. 1993) (before embarking upon the merits of a suppression challenge, a criminal defendant must show that he had a reasonable expectation of privacy in the area searched and in relation to the items seized).
The Court of Appeals for the First Circuit has identified the sort of factors which are pertinent to this threshold inquiry, to wit: ownership, possession, and/or control; historical use of the property searched or the thing seized; ability to regulate access; the totality of the surrounding circumstances; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of such an expectancy under the facts of a given case. Aguirre, 839 F.2d at 857 ; see, e.g. , United States v. Gómez, 770 F.2d 251, 254 (1st Cir. 1985) ; United States v. Lochan, 674 F.2d 960, 965 (1st Cir. 1982).[1] The Court looks to whether the individual thought of the place (or the article) as a private one and treated it as such. If the movant satisfies the Court on this score, then the Court looks to whether the individual's expectation of confidentiality was justifiable under the attendant circumstances. Whatever facts may shed light upon either step of this two-tier inquiry may be weighed in the balance. Aguirre, 839 F.2d at 857.
While property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated, United States v. Salvucci, 448 U.S. 83, 91, 100 S.Ct. 2547, 2553, 65 L.Ed.2d 619 (1980), ownership alone is not dispositive. Rawlings v. Kentucky, 448 U.S. 98, 105, 100 S.Ct. 2556, 2561-62, 65 L.Ed.2d 633 (1980). Courts must look to the totality of the circumstances, and "any precautions taken to exclude others or otherwise maintain a privacy interest will heighten the legitimate expectation of privacy in the protected area." United States v. One 1977 Mercedes Benz, 708 F.2d 444, 449 (9th Cir. 1983).
*88 Santiago testified at the suppression hearing as to the standing issue only. Santiago stated that she is the wife of Defendant Figueroa and has three minor boys with him. See Exhibits 15, 16 and 17. Santiago currently lives in Calle #16, Valle Seco Sector, San José Ward in Toa Baja, Puerto Rico with her three kids. See Exhibits A and A-1. Santiago has owned the house for eight months since December 2017. She bought the house from Cristobal Cruz Figueroa, a cousin of Defendant Figueroa. She started living in said house in March 2018 because prior to that, she and Defendant Figueroa were fixing the house. The house was flooded after the passing of Hurricane María and suffered many damages including the roof which was ripped off. The damage to the different areas of the house can be seen in Exhibits A-3, A-4, A-5, and A-6 which are photographs taken in February 2018. Exhibit A-7 shows Defendant Figueroa on the roof of the house doing repair work prior to his arrest in this case. Exhibits A-8, A-9 and A-10, A-11, A-12 and A-14 show areas of the house as repair work was being done. Exhibit A-13 shows a room in the house already repaired and as it currently looks.
The photographs in Exhibits A-1 through A-14 are of the house where Defendant Figueroa was arrested. Defendant Figueroa had a key to the house when he was arrested. See Exhibits A-19 and A-20.
On cross-examination, Santiago clarified that she moved to the house in March or April 2018. Santiago stated that the house had water and power when she bought it. However, she has never paid for said services. Her neighbors do not pay for utilities either. Santiago paid $10,000.00 in cash for the house. No contract was signed when she bought the house.
In sum, based on Santiago's testimony, which is uncontested, and under the totality of circumstances, the Court concludes that Defendant Figueroa met his burden that he had an expectation of privacy in the house at issue. The house (which Defendant's wife had bought) was being fixed and renovated prior to Defendant Figueroa's arrest. The house was still being renovated when Defendant Figueroa was arrested in the house. Defendant Figueroa had a key to the house when he was arrested. Santiago moved to the house after Defendant was arrested and did not move before because it was being repaired. Thus, Defendant established with the testimony of Santiago that: 1) he had a legitimate presence in the area searched; 2) prior use of the area searched or the property seized; 3) possession or ownership of the area searched or the property seized; 4) ability to control or exclude other's use of the property; and 5) a subjective expectation of privacy. Lochan, 674 F.2d at 965.
In sum, Defendant Figueroa has standing to challenge the admission of illegal items seized under the totality of the circumstances and the evidence before the Court. Moreover, Defendant's expectation of confidentiality was justifiable under the attendant circumstances. Accordingly, Defendant Figueroa has met the threshold established in Aguirre and Lochan.
FINDINGS OF FACT
Pursuant to the testimonies of PRPO Bari and PRPO González, and after assessing their demeanor on the stand and their credibility, the pertinent facts summarized below are uncontested.
Testimony of PRPO Bari:
On February 23, 2018, PRPO Bari was on duty at the Bayamón Stolen Vehicles' Division. His duties that day were part of a work plan to attack crime in high crime areas. On that day, PRPO Bari was assigned to San José Ward in Toa Baja and he went to that area at about 3:00 pm.
*89 PRPO Bari was with fellow officers Sgt. Felix Rivera ("Sgt. Rivera") and Alexander González. They were doing preventive rounds and, while at 16th Street known as Valle Seco, he observed a Toyota Corolla, black, four doors with license plate IRS-091. See Exhibits 3, 4, 5, 5-1, 5-2, 5-3 and 6. PRPO Bari then reported the license plate through a portable radio to the police command center. The license plate came back with a lien that the vehicle was stolen. PRPO Bari ran the license plate because, some weeks before, a message had been sent by the command center that some individuals in a black Toyota Corolla, license plate ending in 091, were committing crimes at shopping centers in the area. Sgt. Rivera told PRPO Bari to wait for a marked police unit to arrive. PRPO Bari then started to do a visual inspection of the Toyota Corolla and he noticed that the locks nor the ignition were forced. That was suspicious in PRPO Bari's experience because it meant that someone had the key of the stolen vehicle. PRPO Bari then started to canvass the area by going house to house looking for the owner or the possessor of the keys of the stolen vehicle. No one had any information about the vehicle.
Then, PRPO Bari (who was in civilian clothing and wearing his badge on his neck) approached a property to the far-left which door was ajar. See Exhibit 7. PRPO Bari said "good afternoon, it is the police." A male (later identified as Defendant Figueroa) came out from the right side and stood in front of the glass door. See Exhibit 8 and 8-1. PRPO Bari observed that Defendant Figueroa had a black pistol on his waistband. PRPO Bari asked Defendant Figueroa if he had a license to carry the firearm. Defendant Figueroa said he did not have a license. PRPO Bari then took away the firearm from Defendant and placed it on his waistband. PRPO Bari arrested Defendant Figueroa, patted him down and gave him the Miranda warnings. PRPO Bari made sure that Defendant Figueroa understood the Miranda warnings by asking him if he understood them. Defendant answered he did understand them. PRPO Bari asked Defendant if he was alone in the house due to safety reasons. Defendant Figueroa said there was no one else in the house. PRPO Bari asked Defendant if he had more firearms and he said he had more firearms. PRPO Bari asked where the firearms were, and Defendant indicated they were in a bedroom. PRPO Bari asked Defendant if he would agree voluntarily to show him where the firearms where and Defendant consented. PRPO Bari then went with Defendant down the hallway to the bedroom on the left with the flash light of his cellular phone because it was dark. Defendant showed PRPO Bari an armoire inside the bedroom. Drugs, paraphernalia and bullets were found in the drawers of the armoire. Three bags were also found. The blue and black bags were in the bedroom and the green bag was inside the closet. See Exhibits 9, 10, 11 and 12.
Exhibit 11 shows the items seized including a cut-off shotgun, two AK-47, two rifles, ammunition and magazines.
PRPO Bari found on Defendant's person the pistol he had seen before and the keys to the stolen Toyota Corolla in one of his pockets. PRPO Bari went to the stolen car with the beeper and the keys and they both worked. PRPO Bari did not search any other bedroom at that time.
Technical Services arrived at the location and an inventory was done. PRPO Bari gave the keys of the property to a neighbor, as instructed by Defendant. Some family members arrived and locked the house.
The Toyota vehicle was searched because it was a stolen vehicle which was *90 recovered. The proper form was filled out. Two magazines and 22 rounds were seized from the interior of the vehicle.
Defendant Figueroa was taken to the PRPD Headquarters in Bayamón. Defendant was presented with the Miranda Warnings form in writing, a consent form and the inventory sheet. Defendant refused to sign the documents. See Joint Exhibit I.
Exhibit 13 is the inventory of the Toyota Corolla.
Exhibit 14 is a photograph of the evidence which was found on Defendant's person, to wit, a Glock pistol, a loaded magazine which was inside the pistol and two cellular phones.
On cross-examination, PRPO Bari testified that Defendant Figueroa never ran and did not threaten the police officers. The house was not on fire and PRPO Bari did not hear anyone screaming. PRPO Bari had never met Defendant Figueroa before.
Testimony of PRPO González:
PRPO González testified that on February 23, 2018, he was on duty with the PRPD. PRPO González was on an undercover vehicle with PRPO Bari and Sgt. Rivera at San José Ward in Toa Baja. PRPO González was there as part of an anti-crime plan doing preventive rounds. PRPO Bari ran the license plate of a Toyota Corolla vehicle which came back as stolen. They stayed back waiting for back up. Other officers went door to door speaking with the residents trying to identify the owner of the Toyota Corolla. PRPO González stayed surveilling the perimeter per instructions of Sgt. Rivera. Then, PRPO González heard PRPO Bari identify himself as police and then said, "raise your hands." Sgt. Rivera was close to PRPO Bari and came out and said that an armed subject was inside. Sgt. Rivera asked PRPO González to keep watching the perimeter. PRPO González followed the instructions.
LEGAL ANALYSIS
A. Police Officers lawfully reached their vantage point .
As properly argued by the Government, the police officers approached the exterior of Defendant Figueroa's residence while investigating a stolen vehicle. It is well settled that "[p]olice may approach citizens in public spaces and ask them questions without triggering the protections of the Fourth Amendment." United States v. Young, 105 F.3d 1, 9 (1st Cir. 1994). Police need not justify such encounters by articulable suspicion of criminal wrongdoing or by any other standard. Id. ("Such police engagements need not find a basis in any articulable suspicion."). A similar standard applies to officers approaching and knocking on the front door of a residence without a warrant. The Supreme Court has held that a police officer not armed with a warrant may approach a home and knock, precisely because that is "no more than any private citizen might do." Florida v. Jardines, 569 U.S. 1, 133 S. Ct. 1409, 1415, 185 L.Ed.2d 495 (2013). Additionally, law enforcement officers need not "shield their eyes" when passing by the home on "public thoroughfares." California v. Ciraolo, 476 U.S. 207, 106 S.Ct. 1809, 1812, 90 L.Ed.2d 210 (1986).
In the case at bar, PRPD officers were in the area on a routine patrol. During the patrol, officers observed a vehicle that was believed to be stolen. Upon further investigation, officers confirmed that the vehicle had been reported stolen. Accordingly, the officers began canvassing the neighborhood to learn additional information and, as part of this canvas, they approached and knocked on Defendant's front door *91 which was ajar. Then, the PRPO Bari saw, through the glass door, that Defendant Figueroa was armed.
B. Warrantless Arrest.
A warrantless arrest is constitutionally valid if, at moment the arrest is made, officers have probable cause to make it; that is, if at that moment, facts and circumstances within their knowledge and of which they had reasonably trustworthy information are sufficient to warrant a prudent man in believing that the arrestee had committed or was committing an offense. United States v. Ayres, 725 F.2d 806 (1st Cir. 1984) ; United States v. Young, 105 F.3d at 6 (same). Whether there is probable cause for a warrantless arrest is determined under an objective standard, not by inquiry into officers' presumed motives. Id.
Probable cause "is a practical, nontechnical conception offering an acceptable compromise between competing societal interests in protecting citizens on the one hand from abusive interferences with privacy and unfounded charges of crime, and on the other hand in recognizing the necessity to afford 'fair leeway for enforcing the law in the community's protection." Brinegar v. United States, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949).
A warrantless arrest requires probable cause, the existence of which must be determined considering the information that law enforcement officials possessed at the time of the arrest. See United States v. Diallo, 29 F.3d 23, 25 (1st Cir. 1994). To establish probable cause, the Government "need not present the quantum of proof necessary to convict." United States v. Uricoechea-Casallas, 946 F.2d 162, 165 (1st Cir. 1991) ; United States v. Meade, 110 F.3d 190, 193 (1st Cir. 1997).
The inquiry into probable cause focuses on what the officer knew at the time of the arrest, United States v. Brown, 169 F.3d 89, 91 (1st Cir. 1999) and should evaluate the totality of the circumstances. United States v. Reyes, 225 F.3d 71, 75 (1st Cir. 2000). "[P]robable cause is a common sense, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Meade, 110 F.3d at 198 n. 11 ; United States v. Vongkaysone, 434 F.3d 68, 73 (1st Cir. 2006).
It is unquestioned that when a defendant is arrested, he may be searched both for evidence of his crimes and for the safety of the officers. "It is also well established that the defendant's lawful arrest permits the police to search his person ..." United States v. Fiasconaro, 315 F.3d 28, 37 (1st Cir. 2002). See also United States v. Doward, 41 F.3d 789, 792-93 (1st Cir. 1994). "[I]t is settled beyond peradventure that a search of an individual's person made incident to a valid arrest is itself valid, despite the absence of an arrest warrant." United States v. Winchenbach, 197 F.3d 548, 552 (1st Cir. 1999).
Turning to the instant case, PPRO Bari's uncontested testimony shows that he personally saw, when approaching the glass door of the house, Defendant Figueroa carrying a firearm on his waistband readily accessible and near the officer. PRPO Bari asked Defendant Figueroa if he had a license to carry the firearm to which he answered in the negative. Possession of a firearm without a license is a violation of Puerto Rico Law.
As properly raised by the United States, the First Circuit has found that "Puerto Rico is a concealed-carry jurisdiction." United States v. Avilés-Vega, 783 F.3d 69, 73 (1st Cir. 2015) ; see also *92 United States v. Padilla-Colón, 578 F.3d 23, 25 n. 1 (1st Cir. 2009) ("The visual display of a firearm is a crime under Puerto Rico law." (citing P.R. Laws Ann. tit. 25, § 456a(d)(1) )). "That means that an individual must carry a firearm in a concealed manner even if he or she possesses a license to carry the firearm." Avilés-Vega, 783 F.3d at 73 (citing P.R. Laws Ann. tit. 25, § 456a(d)(1) ). Therefore, an individual who visually displays a firearm violates Puerto Rico Law even if he possesses a firearms permit. Id.
Accordingly, the law enforcement officers had probable cause to arrest Defendant Figueroa.
It is worth noting that Defendant Figueroa did not take the stand during the suppression hearing, to contradict the testimony of PRPO Bari, even though he had the opportunity to do so. No other documentary evidence or testimonial evidence was presented by Defendant Figueroa on the merits and in support of his motion to suppress, but for the testimony of his wife which was presented solely for the standing issue. As such, the testimony of PRPO Bari, as corroborated in part by the testimony of PRPO González, as to how the facts developed the night of Defendant Figueroa's arrest, are uncontested.
Considering the above, the Court finds that Defendant Figueroa's warrantless arrest was legal and based on probable cause. Accordingly, suppression fails on this ground.
C. Warrantless Search of Home.
The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. To prevail on a claim that a search or seizure violated the Fourth Amendment, a defendant must show as a threshold matter that he had a legitimate expectation of privacy in the place or item searched. Minnesota v. Olson, 495 U.S. 91, 95, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). The inquiry involves a two-part test: first, whether the defendant had an actual, subjective, expectation of privacy; and second, whether that expectation "is one that society is prepared to recognize as objectively reasonable." United States v. Battle, 637 F.3d 44, 48-49 (1st Cir. 2011) ; United States v. Rheault, 561 F.3d 55, 59 (1st Cir. 2009) (citing Smith v. Maryland, 442 U.S. 735, 740-41, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979) ).
Proof of valid consent to search requires that the prosecution show, by a preponderance of the evidence, that the consent was knowingly, intelligently, and voluntarily given. United States v. Marshall, 348 F.3d 281 (1st Cir. 2003).
A warrantless search does not offend the Fourth Amendment when it is properly circumscribed and stands on a voluntary consent given by a person so authorized. United States v. Chaney, 647 F.3d 401, 405-06 (1st Cir. 2011). "Consent is voluntary if it is 'the product of an essentially free and unconstrained choice.' " United States v. Chhien, 266 F.3d 1, 7 (1st Cir. 2001) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) ). In determining voluntariness, the focus is often on whether the individual's will have been overborne and his capacity for self-determination critically impaired. See Schneckloth, 412 U.S. at 225, 93 S.Ct. 2041 ; United States v. Calderón, 77 F.3d 6, 9 (1st Cir.1996).
Determining whether an individual's consent was indeed voluntary or instead the product of coercion requires a highly fact-specific inquiry dependent upon a careful scrutiny of the totality of the circumstances, rather than on a mechanical application of legal factors to a factual scenario. See *93 United States v. Brake, 666 F.3d 800, 806 (1st Cir. 2011) United States v. Vanvliet, 542 F.3d 259, 264 (1st Cir. 2008) ; Marshall, 348 F.3d at 286. The common list of relevant fact drives for assessing whether consent was voluntary includes the person's "age, education, experience, knowledge of the right to withhold consent, and evidence of coercive tactics." Chaney, 647 F.3d at 407 (internal quotation marks omitted); see United States v. Vanvliet, 542 F.3d 259, 264 n. 2 (1st Cir. 2008) (listing range of pertinent factors). While "there is no requirement that the person who gave consent must have been explicitly advised of the right to withhold it," valid consent requires "more than mere acquiescence in the face of an unfounded claim of present lawful authority." United States v. Pérez-Montañez, 202 F.3d 434, 438 (1st Cir. 2000) (citing Schneckloth, 412 U.S. at 234, 93 S.Ct. 2041 and Bumper v. North Carolina, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) ); see also Ohio v. Robinette, 519 U.S. 33, 40, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) ; Chaney, 647 F.3d at 407-08 ; Vanvliet, 542 F.3d at 264.
Further considerations include whether the party was advised of his constitutional rights or whether the consent was obtained by coercive means. United States v. Dunbar, 553 F.3d 48, 57 (1st Cir. 2009).
As to the validity and scope of Defendant Figueroa's consent, we find that it was valid. It is axiomatic that officers must ordinarily procure a warrant before searching a locale to which Fourth Amendment protections apply. See Groh v. Ramírez, 540 U.S. 551, 558-59, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004). Several exceptions to this requirement exist, however, one of which is valid consent to search by someone having authority to give consent. See Pérez-Montañez, 202 F.3d at 438.
For a consent to be valid, the Government must prove by a preponderance of the evidence that the consenting party gave it freely and voluntarily. Marshall, 348 F.3d at 285-86. The assessment of whether consent is free, and voluntary is a question of fact that requires an examination of the totality of the circumstances surrounding the relevant transaction between law-enforcement authorities and the consenting party. Pérez-Montañez, 202 F.3d at 438.
PRPO Bari's testimony as to Defendant Figueroa voluntarily taking him to a bedroom in the house and showing him the illegal items is uncontested. Defendant Figueroa did not take the stand to contradict Bari's testimony that he verbally consented. Defendant did not present any evidence to show that the consent he gave was not intelligent and knowing.
The fact that Defendant Figueroa later at the Police Headquarters refused to sign the consent form does not vitiate the verbal consent he gave while at the house. See Joint Exhibit I. See United States v. Thompson, 876 F.2d 1381, 1384 (8th Cir. 1989) (holding that a defendant's refusal to sign a written consent form-even contemporaneously to the oral consent-was not sufficient grounds for suppression). When weighed against the complete lack of evidence showing coercion and manipulation a later refusal to sign a consent to search is not per se evidence of a lack of consent to the search. See , e.g., United States v. Jones, 523 F.3d 31, 38 (1st Cir. 2008) (consent provided after "some ten to fifteen government agents, guns drawn, entered [the defendant's] hotel suite without knocking, handcuffed him, placed him in a separate room, and proceeded to interrogate him" not coerced); United States v. Barnett, 989 F.2d 546, 555 (1st Cir. 1993) (consent provided after defendant "was met at the door of his home by seven or eight law enforcement officers, with guns drawn," was "arrested and handcuffed,"
*94 and was "advised ... of his Miranda rights" not coerced).
The evidence in this case shows that, after Defendant Figueroa was arrested for illegal possession of a firearm and being provided with the Miranda Warnings, Defendant told the police officers that there were more firearms in the house. Defendant willingly took PRPO Bari to the bedroom where the additional firearms were located.
Importantly, it is uncontested that Defendant was provided with the Miranda warnings immediately when he was arrested. Defendant did not contest in his Motion to Suppress nor in his testimony that he was provided the Miranda warnings upon his arrest.
Moreover, no allegations of coercion were included in the Motion to Suppress and no evidence to that effect was presented at the suppression hearing. No evidence was offered either of Defendant being threatened or coerced; having a diminished mental capacity or disability; being incompetent at the time or being under the influence of drugs or alcohol when he gave the consent to search.
In view of the foregoing, the Government has met its burden by preponderance of the evidence that Defendant's consent to search of his house was both knowing and voluntary.[2]
CONCLUSION
Wherefore, it is recommended to the Court that Defendant Figueroa's Motion to Suppress (Docket No. 25) be DENIED.
IT IS SO RECOMMENDED.
The parties have fourteen (14) days to file any objections to this report and recommendation. Fed. R. Crim. P. 59 (b)(2). Failure to file same within the specified time waives the right to appeal this order. Henley Drilling Co. v. McGee, 36 F.3d 143, 150-151 (1st Cir. 1994) ; United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir.1986) ; see also Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 991 (1st Cir. 1988) ("Systemic efficiencies would be frustrated and the magistrate's role reduced to that of a mere dress rehearser if a party were allowed to feint and weave at the initial hearing, and save its knockout punch for the second round.").

A Supplement to Post-Hearing Brief was subsequently filed by the defendant submitting additional authorities. See Dkt. No. 77. The Government requested that the supplemental motion be stricken from the record as untimely. See Dkt. No. 79. The Court, in the best interest of justice, decided not to strike the supplemental motion as it found that "there is a potential Fourth Amendment issue that must be properly analyzed and ruled upon." See Dkt. No. 80. The Government was then given additional time to properly oppose to the defendant's supplemental brief. Yet, no opposition was filed. See Id.

According to PRPD Bari, the door was "more or less a foot" open. Transcript of the De Novo Suppression Hearing , Dkt. No. 72, p. 22, l. 6.

The District Court found no record that supports this conclusion.

Puerto Rico is a "concealed-carry" jurisdiction. As such, the visual display of a firearm is a crime under Puerto Rico law. See United States v. Padilla-Colon, 578 F.3d 23, 25 (1st Cir. 2009).

The defendant never lived on the property as he was arrested during the remodeling of the property.

Dkt. No. 72 at p. 22, l. 21-25 to p. 23, l. 2.

The factors that a court must take into account prior to deciding whether the defendant requesting the suppression had the expectation of privacy that grants him/her the standing to request the suppression include: 1) legitimate presence in the area searched; 2) prior use of the area searched or the property seized; 3) possession or ownership of the area searched or the property seized; 4) ability to control or exclude other's use of the property; and 5) a subjective expectation of privacy. Lochan, 674 F.2d at 965.

The warrantless search of the house was justified based on Defendant's consent. As such, the Court does not need to discuss the exigent circumstances exception.